REGAN, SECRETARY OF THE TREASURY, ET AL. *v.*
TAXATION WITH REPRESENTATION
OF WASHINGTON

No. 81–2338.   Argued March 22, 1983—Decided May 23, 1983*

---

*Together with No. 82–134, *Taxation With Representation of Washington* v. *Regan, Secretary of the Treasury, et al.*, also on appeal from the same court.

REHNQUIST, J., delivered the opinion for a unanimous Court. BLACK-MUN, J., filed a concurring opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 551.

*Solicitor General Lee* argued the cause for appellants in No. 81–2338. With him on the briefs were *Assistant Attorney General Archer, Deputy Solicitor General Wallace, Stuart A. Smith, Richard Farber,* and *Robert S. Pomerance.*

*John Cary Sims* argued the cause for appellee in No. 81–2338. With him on the brief were *Alan B. Morrison* and *Thomas F. Field.*†

JUSTICE REHNQUIST delivered the opinion of the Court.

Appellee Taxation With Representation of Washington (TWR) is a nonprofit corporation organized to promote what it conceives to be the "public interest" in the area of federal

---

†Briefs of *amici curiae* urging reversal were filed by *Sheldon S. Cohen, Julie Noel Gilbert, Dennis B. Drapkin, George H. Gangwere,* and *Wilmer S. Schantz, Jr.,* for the Veterans of Foreign Wars of the United States; by *Joseph C. Zengerle* and *Zachary R. Karol* for the Disabled American Veterans et al.; and by *Mitchell Rogovin* and *George T. Frampton, Jr.,* for the American Legion.

*Thomas A. Troyer, H. David Rosenbloom, Albert G. Lauber, Jr.,* and *John G. Milliken* filed a brief for the American Association of Museums et al. as *amici curiae* urging affirmance.

taxation. It proposes to advocate its point of view before Congress, the Executive Branch, and the Judiciary. This case began when TWR applied for tax-exempt status under § 501(c)(3) of the Internal Revenue Code, 26 U. S. C. § 501(c)(3). The Internal Revenue Service denied the application because it appeared that a substantial part of TWR's activities would consist of attempting to influence legislation, which is not permitted by § 501(c)(3).[1]

TWR then brought this suit in District Court against the appellants, the Commissioner of Internal Revenue, the Secretary of the Treasury, and the United States, seeking a declaratory judgment that it qualifies for the exemption granted by § 501(c)(3). It claimed the prohibition against substantial lobbying is unconstitutional under the First Amendment and the equal protection component of the Fifth Amendment's Due Process Clause.[2] The District Court granted summary judgment for appellants. On appeal, the en banc Court of Appeals for the District of Columbia Circuit reversed, holding that § 501(c)(3) does not violate the First Amendment but does violate the Fifth Amendment. 219 U. S. App. D. C. 117, 676 F. 2d 715 (1982). Appellants appealed pursuant to 28 U. S. C. § 1252, and TWR cross-

---

[1] Section § 501(c)(3) grants exemption to:

"Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition . . . , or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, *no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation* (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office" (emphasis supplied).

[2] The Due Process Clause imposes on the Federal Government requirements comparable to those that the Equal Protection Clause of the Fourteenth Amendment imposes on the States. *E. g.*, *Schweiker* v. *Wilson*, 450 U. S. 221, 226, n. 6 (1981).

appealed. We noted probable jurisdiction of the appeal, 459 U. S. 819 (1982).[3]

TWR was formed to take over the operations of two other nonprofit corporations. One, Taxation With Representation Fund, was organized to promote TWR's goals by publishing a journal and engaging in litigation; it had tax-exempt status under § 501(c)(3). The other, Taxation With Representation, attempted to promote the same goals by influencing legislation; it had tax-exempt status under § 501(c)(4).[4] Neither predecessor organization was required to pay federal income taxes. For purposes of our analysis, there are two principal differences between § 501(c)(3) organizations and § 501(c)(4) organizations. Taxpayers who contribute to § 501(c)(3) organizations are permitted by § 170(c)(2) to deduct the amount of their contributions on their federal income tax returns, while contributions to § 501(c)(4) organizations are not deductible. Section 501(c)(4) organizations, but not § 501(c)(3) organizations, are permitted to engage in substantial lobbying to advance their exempt purposes.

In these cases, TWR is attacking the prohibition against substantial lobbying in § 501(c)(3) because it wants to use tax-

---

[3] Appellants contend that we lack jurisdiction of the cross-appeal because 28 U. S. C. § 1252 refers only to appeals, and this Court's Rule 12.4 only establishes a procedure for taking a cross-appeal. Section 1252 provides:

"*Any party* may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States . . . holding an Act of Congress unconstitutional in any civil action . . . to which the United States or any of its agencies . . . is a party" (emphasis supplied).

This language is broad enough to encompass appellee's cross-appeal. We hold that it does. Therefore, we deny the appellants' motion to dismiss, and decide the cross-appeal together with the appeal.

[4] Unless otherwise indicated, all citations to statutes in this opinion refer to the Internal Revenue Code, 26 U. S. C.

Section 501(c)(4) grants exemption to:

"Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, . . . and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes."

deductible contributions to support substantial lobbying activities. To evaluate TWR's claims, it is necessary to understand the effect of the tax-exemption system enacted by Congress.

Both tax exemptions and tax deductibility are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income. Deductible contributions are similar to cash grants of the amount of a portion of the individual's contributions.[5] The system Congress has enacted provides this kind of subsidy to nonprofit civic welfare organizations generally, and an additional subsidy to those charitable organizations that do not engage in substantial lobbying. In short, Congress chose not to subsidize lobbying as extensively as it chose to subsidize other activities that nonprofit organizations undertake to promote the public welfare.

It appears that TWR could still qualify for a tax exemption under § 501(c)(4). It also appears that TWR can obtain tax-deductible contributions for its nonlobbying activity by returning to the dual structure it used in the past, with a § 501(c)(3) organization for nonlobbying activities and a § 501(c)(4) organization for lobbying. TWR would, of course, have to ensure that the § 501(c)(3) organization did not subsidize the § 501(c)(4) organization; otherwise, public funds might be spent on an activity Congress chose not to subsidize.[6]

---

[5] In stating that exemptions and deductions, on the one hand, are like cash subsidies, on the other, we of course do not mean to assert that they are in all respects identical. See, e. g., *Walz* v. *Tax Comm'n*, 397 U. S. 664, 674–676 (1970); *id.*, at 690–691 (BRENNAN, J., concurring); *id.*, at 699 (opinion of Harlan, J.).

[6] TWR and some *amici* are concerned that the IRS may impose stringent requirements that are unrelated to the congressional purpose of ensuring that no tax-deductible contributions are used to pay for substantial lobbying, and effectively make it impossible for a § 501(c)(3) organization to

TWR contends that Congress' decision not to subsidize its lobbying violates the First Amendment. It claims, relying on *Speiser* v. *Randall*, 357 U. S. 513 (1958), that the prohibition against substantial lobbying by § 501(c)(3) organizations imposes an "unconstitutional condition" on the receipt of tax-deductible contributions. In *Speiser*, California established a rule requiring anyone who sought to take advantage of a property tax exemption to sign a declaration stating that he did not advocate the forcible overthrow of the Government of the United States. This Court stated that "[t]o deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech." *Id.*, at 518.

TWR is certainly correct when it states that we have held that the government may not deny a benefit to a person because he exercises a constitutional right. See *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972). But TWR is just as certainly incorrect when it claims that this case fits the *Speiser-Perry* model. The Code does not deny TWR the right to receive deductible contributions to support its non-lobbying activity, nor does it deny TWR any independent benefit on account of its intention to lobby. Congress has merely refused to pay for the lobbying out of public moneys. This Court has never held that Congress must grant a benefit such as TWR claims here to a person who wishes to exercise a constitutional right.

---

establish a § 501(c)(4) lobbying affiliate. No such requirement in the Code or regulations has been called to our attention, nor have we been able to discover one. The IRS apparently requires only that the two groups be separately incorporated and keep records adequate to show that tax-deductible contributions are not used to pay for lobbying. This is not unduly burdensome.

We also note that TWR did not bring this suit because it was unable to operate with the dual structure and seeks a less stringent set of bookkeeping requirements. Rather, TWR seeks to force Congress to subsidize its lobbying activity. See Tr. of Oral Arg. 37–39.

This aspect of these cases is controlled by *Cammarano* v. *United States*, 358 U. S. 498 (1959), in which we upheld a Treasury Regulation that denied business expense deductions for lobbying activities. We held that Congress is not required by the First Amendment to subsidize lobbying. *Id.*, at 513. In these cases, as in *Cammarano*, Congress has not infringed any First Amendment rights or regulated any First Amendment activity. Congress has simply chosen not to pay for TWR's lobbying. We again reject the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Id.*, at 515 (Douglas, J., concurring).[7]

TWR also contends that the equal protection component of the Fifth Amendment renders the prohibition against substantial lobbying invalid. TWR points out that § 170(c)(3) permits taxpayers to deduct contributions to veterans' organizations that qualify for tax exemption under § 501(c)(19). Qualifying veterans' organizations are permitted to lobby as much as they want in furtherance of their exempt purposes.[8]

---

[7] *Citizens Against Rent Control/Coalition for Fair Housing* v. *City of Berkeley*, 454 U. S. 290 (1981), upon which TWR relies, is not to the contrary. In that case the challenged ordinance regulated First Amendment activity by limiting individuals' expenditures of their own money on political speech.

TWR contends that Congress has overruled *Cammarano* by enacting § 162(e), which permits businesses to deduct certain lobbying expenses that are "ordinary and necessary [business] expenses." See Brief for Appellee 13. It is elementary that Congress' decision to permit deductions does not affect this Court's holding that refusing to permit them does not violate the Constitution.

[8] The rules governing deductibility of contributions to veterans' organizations are not the same as the analogous rules for § 501(c)(3) organizations. For example, an individual may generally deduct up to 50% of his adjusted gross income in contributions to § 501(c)(3) organizations, but only 20% in contributions to veterans' organizations. Compare § 170(b)(1)(A) with § 170(b)(1)(B). Taxpayers are permitted to carry over excess contributions to § 501(c)(3) organizations, but not veterans' organizations, to

TWR argues that because Congress has chosen to subsidize the substantial lobbying activities of veterans' organizations, it must also subsidize the lobbying of § 501(c)(3) organizations.

Generally, statutory classifications are valid if they bear a rational relation to a legitimate governmental purpose. Statutes are subjected to a higher level of scrutiny if they interfere with the exercise of a fundamental right, such as freedom of speech, or employ a suspect classification, such as race. *E. g.*, *Harris* v. *McRae*, 448 U. S. 297, 322 (1980). Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes. More than 40 years ago we addressed these comments to an equal protection challenge to tax legislation:

> "The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized . . . . [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. Traditionally classification has been a device for fitting tax programs to local needs and usages in order to achieve an equitable distribution of the tax burden. It has, because of this, been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. The burden is

the next year. § 170(d). There are other differences. If it were entitled to equal treatment with veterans' organizations, TWR would, of course, be entitled only to the benefits they receive, not to more.

on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Madden* v. *Kentucky*, 309 U. S. 83, 87–88 (1940) (footnotes omitted).

See also *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 40–41 (1973); *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U. S. 356, 359–360 (1973).

We have already explained why we conclude that Congress has not violated TWR's First Amendment rights by declining to subsidize its First Amendment activities. The case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to "'ai[m] at the suppression of dangerous ideas.'" *Cammarano, supra,* at 513, quoting *Speiser,* 357 U. S., at 519. But the veterans' organizations that qualify under § 501(c)(19) are entitled to receive tax-deductible contributions regardless of the content of any speech they may use, including lobbying. We find no indication that the statute was intended to suppress any ideas or any demonstration that it has had that effect. The sections of the Internal Revenue Code here at issue do not employ any suspect classification. The distinction between veterans' organizations and other charitable organizations is not at all like distinctions based on race or national origin.

The Court of Appeals nonetheless held that "strict scrutiny" is required because the statute "*affect[s]* First Amendment rights on a discriminatory basis." 219 U. S. App. D. C., at 130, 676 F. 2d, at 728 (emphasis supplied). Its opinion suggests that strict scrutiny applies whenever Congress subsidizes some speech, but not all speech. This is not the law. Congress could, for example, grant funds to an organization dedicated to combating teenage drug abuse, but condition the grant by providing that none of the money received from Congress should be used to lobby state legislatures. Under *Cammarano,* such a statute would be valid. Congress might also enact a statute providing public money

for an organization dedicated to combating teenage alcohol abuse, and impose no condition against using funds obtained from Congress for lobbying. The existence of the second statute would not make the first statute subject to strict scrutiny.

Congressional selection of particular entities or persons for entitlement to this sort of largesse "is obviously a matter of policy and discretion not open to judicial review unless in circumstances which here we are not able to find. *United States* v. *Realty Co.*, [163 U. S. 427,] 444 [(1896)]." *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308, 317 (1937). See also, *id.*, at 313; *Alabama* v. *Texas*, 347 U. S. 272 (1954). For the purposes of these cases appropriations are comparable to tax exemptions and deductions, which are also "a matter of grace [that] Congress can, of course, disallow . . . as it chooses." *Commissioner* v. *Sullivan*, 356 U. S. 27, 28 (1958).

These are scarcely novel principles. We have held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny. *Buckley* v. *Valeo*, 424 U. S. 1 (1976), upheld a statute that provides federal funds for candidates for public office who enter primary campaigns, but does not provide funds for candidates who do not run in party primaries. We rejected First Amendment and equal protection challenges to this provision without applying strict scrutiny. *Id.*, at 93–108. *Harris* v. *McRae, supra*, and *Maher* v. *Roe*, 432 U. S. 464 (1977), considered legislative decisions not to subsidize abortions, even though other medical procedures were subsidized. We declined to apply strict scrutiny and rejected equal protection challenges to the statutes.

The reasoning of these decisions is simple: "although government may not place obstacles in the path of a [person's] exercise of . . . freedom of [speech], it need not remove those

not of its own creation." *Harris*, 448 U. S., at 316. Although TWR does not have as much money as it wants, and thus cannot exercise its freedom of speech as much as it would like, the Constitution "does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom." *Id.*, at 318. As we said in *Maher*, "[c]onstitutional concerns are greatest when the State attempts to impose its will by force of law . . . ." 432 U. S., at 476. Where governmental provision of subsidies is not "'aimed at the suppression of dangerous ideas,'" *Cammarano*, 358 U. S., at 513, its "power to encourage actions deemed to be in the public interest is necessarily far broader." *Maher*, *supra*, at 476.

We have no doubt but that this statute is within Congress' broad power in this area. TWR contends that § 501(c)(3) organizations could better advance their charitable purposes if they were permitted to engage in substantial lobbying. This may well be true. But Congress—not TWR or this Court—has the authority to determine whether the advantage the public would receive from additional lobbying by charities is worth the money the public would pay to subsidize that lobbying, and other disadvantages that might accompany that lobbying. It appears that Congress was concerned that exempt organizations might use tax-deductible contributions to lobby to promote the private interests of their members. See 78 Cong. Rec. 5861 (1934) (remarks of Sen. Reed); *id.*, at 5959 (remarks of Sen. La Follette). It is not irrational for Congress to decide that tax-exempt charities such as TWR should not further benefit at the expense of taxpayers at large by obtaining a further subsidy for lobbying.

It is also not irrational for Congress to decide that, even though it will not subsidize substantial lobbying by charities generally, it will subsidize lobbying by veterans' organizations. Veterans have "been obliged to drop their own affairs to take up the burdens of the nation," *Boone* v. *Lightner*, 319

U. S. 561, 575 (1943), "'subjecting themselves to the mental and physical hazards as well as the economic and family detriments which are peculiar to military service and which do not exist in normal civil life.'" *Johnson* v. *Robison*, 415 U. S. 361, 380 (1974) (emphasis deleted). Our country has a longstanding policy of compensating veterans for their past contributions by providing them with numerous advantages.[9] This policy has "always been deemed to be legitimate." *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256, 279, n. 25 (1979).

The issue in these cases is not whether TWR must be permitted to lobby, but whether Congress is required to provide it with public money with which to lobby. For the reasons stated above, we hold that it is not. Accordingly, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring.

I join the Court's opinion. Because 26 U. S. C. § 501's discrimination between veterans' organizations and charitable organizations is not based on the content of their speech, *ante*, at 548, I agree with the Court that § 501 does not deny charitable organizations equal protection of the law. The benefit provided to veterans' organizations is rationally based on the Nation's time-honored policy of "compensating veterans for their past contributions." *Ante*, this page. As the Court says, *ante*, at 548 and 550, a statute designed to discourage the expression of particular views would present a very different question.

I also agree that the First Amendment does not require the Government to subsidize protected activity, *ante*, at 546,

---

[9] See, *e. g., Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256 (1979) (veterans' preference in civil service employment); *Johnson* v. *Robison*, 415 U. S. 361 (1974) (educational benefits).

and that this principle controls disposition of TWR's First Amendment claim. I write separately to make clear that in my view the result under the First Amendment depends entirely upon the Court's necessary assumption—which I share—about the manner in which the Internal Revenue Service administers § 501.

If viewed in isolation, the lobbying restriction contained in § 501(c)(3) violates the principle, reaffirmed today, *ante*, at 545, "that the government may not deny a benefit to a person because he exercises a constitutional right." Section 501(c)(3) does not merely deny a subsidy for lobbying activities, see *Cammarano* v. *United States*, 358 U. S. 498 (1959); it deprives an otherwise eligible organization of its tax-exempt status and its eligibility to receive tax-deductible contributions for all its activities, whenever one of those activities is "substantial lobbying." Because lobbying is protected by the First Amendment, *Eastern Railroad Presidents Conf.* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127, 137–138 (1961), § 501(c)(3) therefore denies a significant benefit to organizations choosing to exercise their constitutional rights.*

The constitutional defect that would inhere in § 501(c)(3) alone is avoided by § 501(c)(4). As the Court notes, *ante*, at 544, TWR may use its present § 501(c)(3) organization for its nonlobbying activities and may create a § 501(c)(4) affiliate to pursue its charitable goals through lobbying.

---

*See *Speiser* v. *Randall*, 357 U. S. 513, 518–519 (1958); *Cammarano* v. *United States*, 358 U. S. 498, 515 (1959) (Douglas, J., concurring) (denial of business-expense deduction for lobbying is constitutional, but an attempt to deny all deductions for business expenses to a taxpayer who lobbies would penalize unconstitutionally the exercise of First Amendment rights); cf. *Harris* v. *McRae*, 448 U. S. 297, 317, n. 19 (1980) (denial of welfare benefits for abortion is constitutional, but an attempt to withhold all welfare benefits from one who exercises right to an abortion probably would be impermissible); *Maher* v. *Roe*, 432 U. S. 464, 474–475, n. 8 (1977) (same).

The § 501(c)(4) affiliate would not be eligible to receive tax-deductible contributions.

Given this relationship between § 501(c)(3) and § 501(c)(4), the Court finds that Congress' purpose in imposing the lobbying restriction was merely to ensure that "no tax-deductible contributions are used to pay for substantial lobbying." *Ante*, at 544, n. 6; see *ante*, at 545. Consistent with that purpose, "[t]he IRS apparently requires only that the two groups be separately incorporated and keep records adequate to show that tax-deductible contributions are not used to pay for lobbying." *Ante*, at 545, n. 6. As long as the IRS goes no further than this, we perhaps can safely say that "[t]he Code does not deny TWR the right to receive deductible contributions to support its nonlobbying activity, nor does it deny TWR any independent benefit on account of its intention to lobby." *Ante*, at 545. A § 501(c)(3) organization's right to speak is not infringed, because it is free to make known its views on legislation through its § 501(c)(4) affiliate without losing tax benefits for its nonlobbying activities.

Any significant restriction on this channel of communication, however, would negate the saving effect of § 501(c)(4). It must be remembered that § 501(c)(3) organizations retain their constitutional right to speak and to petition the Government. Should the IRS attempt to limit the control these organizations exercise over the lobbying of their § 501(c)(4) affiliates, the First Amendment problems would be insurmountable. It hardly answers one person's objection to a restriction on his speech that another person, outside his control, may speak for him. Similarly, an attempt to prevent § 501(c)(4) organizations from lobbying explicitly on behalf of their § 501(c)(3) affiliates would perpetuate § 501(c)(3) organizations' inability to make known their views on legislation without incurring the unconstitutional penalty. Such restrictions would extend far beyond Congress' mere refusal to subsidize lobbying. See *ante*, at 544–545, n. 6. In my view,

any such restriction would render the statutory scheme unconstitutional.

I must assume that the IRS will continue to administer §§ 501(c)(3) and 501(c)(4) in keeping with Congress' limited purpose and with the IRS's duty to respect and uphold the Constitution. I therefore agree with the Court that the First Amendment questions in these cases are controlled by *Cammarano* v. *United States*, 358 U. S. 498, 513 (1959), rather than by *Speiser* v. *Randall*, 357 U. S. 513, 518–519 (1958), and *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972).