EARL WEINGARDEN AND SHIRLEY WEINGARDEN,
PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 1864-84.      Filed April 14, 1986.

*Robert W. Siegel,* for the petitioners.
*Daniel M. Carr,* for the respondent.

OPINION

SWIFT, *Judge*: In a statutory notice of deficiency dated November 25, 1983, respondent determined deficiencies in petitioners' Federal income tax liabilities for the years 1979 and 1980 in the amounts of $32,793 and $104,669, respectively.

Following concessions by the parties, the only issue for decision is whether the charitable deduction to which petitioners are entitled for a contribution of real estate to a local post of the Veterans of Foreign Wars is governed by the limitation of 50 percent of petitioners' contribution base, pursuant to section 170(b)(1)(A),[1] or by the limitation of 20 percent of petitioners' contribution base, pursuant to section 170(b)(1)(B). In the event that the charitable deduction is held to be governed by section 170(b)(1)(A), as petitioners contend, the parties agree that the deduction allowable to petitioners in 1979 will be limited by section 170(b)(1)(C) to 30 percent of petitioners' contribution base (because of the capital gain nature of the property contributed), and that the portion of the contribution not allowed as a deduction in 1979 will be available for a carryover to

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

subsequent taxable years. In the event that the charitable deduction is held to be governed by section 170(b)(1)(B), as respondent contends, the parties agree that the deduction allowable in 1979 will be limited to 20 percent of petitioners' contribution base and no carryover to subsequent years will be allowed of the portion of the contribution not allowed as a deduction in 1979.

This case was submitted fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The facts set forth in the stipulation are incorporated herein by this reference. The pertinent facts are summarized below.

Petitioners Earl and Shirley Weingarden are husband and wife and resided in Franklin, Michigan, at the time their petition was filed herein. Petitioners timely filed their joint Federal income tax returns for the years 1979 and 1980.

On November 9, 1979, petitioners conveyed, as a charitable contribution, title to certain real estate to the Southgate, Michigan Post of the Veterans of Foreign Wars (hereinafter referred to as the Southgate Post). The real estate consisted of land and a building and was located in the city of Southgate, Michigan. The parties have stipulated that the value of the real estate was $435,000 on the day of the contribution.

On November 9, 1979, the Southgate Post was a nonprofit Michigan corporation in good standing and was exempt from Federal income tax pursuant to the provisions of section 501(c)(19). The Southgate Post accepted the contribution and agreed to occupy and use the real estate for purposes consistent with its corporate bylaws and national charter.

The Southgate Post routinely filed its Federal income tax returns on Form 990 (Return of Organization Exempt from Tax) and on Form 990-T (Exempt Organization Business Income Tax Return). The Forms 990-T filed for each of the years 1976, 1977, and 1978 indicate that no unrelated trade or business gross income was received during those years. The Forms 990 filed on behalf of the Southgate Post for its taxable years 1976, 1977, and 1978 indicate the following sources and amounts of income:

| Sources of income | 1976 | 1977 | 1978 |
|---|---|---|---|
| Interest | $3,967 | 0 | 0 |
| Poppy sales, bingo, dances[2] | 35,315 | - - - | - - - |
| Contributions, gifts, grants | 2,161 | $2,000.00 | $994.00 |
| Rent | 0 | 4,747.00 | 2,745.00 |
| Bingo[2] | 0 | 14,050.00 | 14,676.21 |
| Poppy sales[2] | 0 | 634.19 | 315.85 |
| Raffles | 0 | 195.50 | 0 |
| Dance[2] | 0 | 105.50 | 706.00 |
| Lottery | 0 | 800.00 | 0 |
| Coin machine | 0 | 25.52 | 48.42 |
| Refunds/misc. | 0 | 533.83 | 180.33 |
| Dues and assessments from members and affiliates | 0 | 3,824.45 | 1,456.75 |
| Miscellaneous | 0 | 0 | 2,995.11 |
| Total | 41,443 | 26,915.99 | 24,117.67 |

The primary source of income received by the Southgate Post was the bingo games operated by unpaid volunteers. Michigan law provides that a "qualified organization" (as defined in Mich. Stat. Ann. sec. 18.969(103) (Callaghan 1980)), including a veterans' organization which operates without profit to its members, may be licensed to conduct bingo games 1 night per week without losing its exemption from State tax. Mich. Stat. Ann. sec. 18.969(105) (Callaghan 1980). Section 513(f), with certain limitations, provides that bingo games will not be treated as an unrelated trade or business. See also sec. 1.513-5, Income Tax Regs.

Section 170(a) allows a deduction for any charitable contribution made within the taxable year. The term "charitable contribution" includes a donation to or for the use of a post or organization of war veterans organized in the United States where no part of the net earnings of the organization inures to the benefit of any private shareholder or individual. Sec. 170(c)(3).

Certain dollar limitations apply to tax deductions allowed for charitable contributions made by individuals. The limitation that applies to a particular contribution depends on the nature of the donee and on the type of property contributed. Section 170(b)(1)(A) sets forth the general rule with regard to contributions made to eight categories of charitable donees. That rule provides that tax deductions available

---

[2]"Poppy sales, bingo, dances," were grouped together as one category on the 1976 income tax return. Those items were stated separately on the 1977 and 1978 returns. No information was provided by the parties herein with respect to Southgate Post's 1979 Federal tax returns.

to an individual taxpayer in any one year with respect to contributions made to the charitable donees described in the eight clauses of section 170(b)(1)(A) are limited to 50 percent of the taxpayer's contribution base,[3] and carryovers are allowed to subsequent years of excess contributions. Sec. 170(d).

A further limitation on tax deductions allowed individuals with regard to contributions of property to the categories of donees described in the eight clauses of section 170(b)(1)(A) is set forth in section 170(b)(1)(C)(i) and relates to the type of property contributed.[4] That limitation provides generally that the tax deduction allowed to an individual in any one year with respect to charitable contributions of "certain capital gain property" (where the donees otherwise qualify under section 170(b)(1)(A)) shall be limited to 30 percent of the taxpayer's contribution base for each year.

If contributions are made to a charitable donee that does not qualify under any of the eight clauses of section 170(b)(1)(A), the tax deductions allowed to an individual in any one year with respect thereto are limited by section 170(b)(1)(B) to 20 percent of the taxpayer's contribution base, and no carryover of the excess contribution is allowed in subsequent years.

Petitioners contend that the Southgate Post qualifies under the eighth clause of section 170(b)(1)(A) and that the 50-percent limitation therefore is applicable. Respondent contends that the Southgate Post does not qualify under the eighth clause of section 170(b)(1)(A) and that the 20-percent limitation, therefore, is applicable to the contribution in question.

Section 170(b)(1)(A)(viii) provides simply as follows:

(A) GENERAL RULE.—Any charitable contribution to—

---

[3]Sec. 170(b)(1)(E) defines "contribution base" as follows:

(E) CONTRIBUTION BASE DEFINED.—For purposes of this section, the term "contribution base" means adjusted gross income (computed without regard to any net operating loss carryback to the taxable year under section 172).

[4]Sec. 170(b)(1)(C)(i) provides in part as follows:

(i) In the case of charitable contributions of capital gain property to which subsection (e)(1)(B) does not apply, the total amount of contributions of such property which may be taken into account under subsection (a) for any taxable year shall not exceed 30 percent of the taxpayer's contribution base for such year. For purposes of this subsection, contributions of capital gain property to which this paragraph applies shall be taken into account after all other charitable contributions.

\*     \*     \*     \*     \*     \*     \*

(viii) an organization described in section 509(a)(2) or (3) \* \* \*

Respondent herein agrees that the Southgate Post meets the financial support requirements of section 509(a)(2).[5] Respondent argues however that (in referring to and incorporating therein the financial support requirements of section 509(a)(2)) clause (viii) of section 170(b)(1)(A) also incorporates therein the requirement that the organization in question qualify for its Federal tax exemption under section 501(c)(3) (which relates primarily to religious, charitable, scientific, and educational organizations). Because the Southgate Post qualifies for its Federal tax exemption under section 501(c)(19)[6] and not under section 501(c)(3),

---

[5]Sec. 509(a) provides as follows:

SEC. 509(a). GENERAL RULE.—For purposes of this title, the term "private foundation" means a domestic or foreign organization described in section 501(c)(3) other than—
    (1) an organization described in section 170(b)(1)(A) (other than in clauses (vii) and (viii));
    (2) an organization which—
        (A) normally receives more than one-third of its support in each taxable year from any combination of—
            (i) gifts, grants, contributions, or membership fees, and
            (ii) gross receipts from admissions, sales of merchandise, performance of services, or furnishing of facilities, in an activity which is not an unrelated trade or business (within the meaning of section 513), not including such receipts from any person, or from any bureau or similar agency of a govermental unit (as described in section 170(c)(1)), in any taxable year to the extent such receipts exceed the greater of $5,000 or 1 percent of the organization's support in such taxable year, from persons other than disqualified persons (as defined in section 4946) with respect to the organization, from governmental units described in section 170(c)(1), or from organizations described in section 170(b)(1)(A) (other than in clauses (vii) and (viii)), and
        (B) normally receives not more than one-third of its support in each taxable year from the sum of—
            (i) gross investment income (as defined in subsection (e)) and
            (ii) the excess (if any) of the amount of the unrelated business taxable income (as defined in section 512) over the amount of the tax imposed by section 511;
    (3) an organization which—
        (A) is organized, and at all times thereafter is operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more specified organizations described in paragraph (1) or (2),
        (B) is operated, supervised, or controlled by or in connection with one or more organizations, described in paragraph (1) or (2), and
        (C) is not controlled directly or indirectly by one or more disqualified persons (as defined in section 4946) other than foundation managers and other than one or more organizations described in paragraph (1) or (2); and

      \*     \*     \*     \*     \*     \*     \*

For purposes of paragraph (3), an organization described in paragraph (2), shall be deemed to include an organization described in section 501(c)(4), (5), or (6) which would be described in paragraph (2) if it were an organization described in section 501(c)(3).

[6]Sec. 501(c)(19) provides as follows—

SEC. 501(c). LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):
      \*     \*     \*     \*     \*     \*     \*

respondent contends that the Southgate Post does not qualify as an organization described in section 509(a)(2) as those provisions are incorporated into the provisions of section 170(b)(1)(A)(viii).

The controversy herein thus turns on whether the reference in clause (viii) of section 170(b)(1)(A) to "section 509(a)(2)" was intended only to incorporate therein the financial support requirements set forth in section 509(a)(2) (both of which respondent concedes the Southgate Post met in 1979), or whether the reference in clause (viii) of section 170(b)(1)(A) to section 509(a)(2) also incorporates the introductory language of section 509(a), in which case the donee organization would have to qualify as an "organization described in section 501(c)(3)" in order to meet the requirements of section 170(b)(1)(A)(viii). As noted, the Southgate Post bases its tax-exempt status on section 501(c)(19), not on section 501(c)(3).

This case raises an issue of first impression. The Supreme Court in dicta and in a footnote in *Regan v. Taxation with Representation of Washington*, 461 U.S. 540 (1983), stated that donations to veterans' organizations were subject to the 20-percent limitation of section 170(b)(1)(B). The issue concerning whether the 20- or the 50-percent limitation applied to veterans' organizations, however, was not before the Supreme Court in that case, and no explanation or analysis of the relevant statutory provisions was provided. The text of the footnote states as follows:

The rules governing the deductibility of contributions to veterans' organizations are not the same as the analogous rules for section 501(c)(3) organizations. For example, an individual may generally deduct up to 50% of his adjusted gross income in contributions to section 501(c)(3) organizations, but only 20% in contributions to veterans' organizations. Compare section 170(b)(1)(A) with section 170(b)(1)(B). Taxpayers are permitted to carry over excess contributions to section 501(c)(3) organiza-

---

(19) A post or organization of war veterans, or an auxiliary unit or society of, or a trust or foundation for, any such post or organization—

    (A) organized in the United States or any of its possessions, issues unless and until they arise.

    (B) at least 75 percent of the members of which are war veterans and substantially all of the other members of which are individuals who are veterans (but not war veterans), or are cadets, or are spouses, widows, or widowers of war veterans or such individuals, and

    (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual.

tions, but not veterans' organizations, to the next year. Section 170(d) * * * [461 U.S. at 546 n. 8.]

A number of tax publications also state that donations to veterans' organizations are subject to the lower 20-percent limitation and do not qualify under section 170(b)(1)(A) for the higher 50-percent limitation. See S. Weithorn, Tax Techniques for Foundations and Other Exempt Organizations, pt. X, sec. 64.02, at 64-8 (Supp. 1980); Jackson & Muller, "Charitable Contributions—Percentage Limitations," 292 2d Tax Management (BNA) A-10 (1981); Geer & Spevack, "Private Foundations—Definition and Classification," 296 2d Tax Management (BNA) A-3 (1982).[7] Such statements, however, also are made without any explanation of how that conclusion was reached.

One article we have located states that veterans' organizations will qualify as a 50-percent organization under section 170(b)(1)(A)(viii) if the particular veterans' organization meets the specific financial support requirements of section 509(a)(2). Sorlien & Olsen, "Analyzing the New Charitable Contributions Rules: Planning, Pitfalls, Problems," 32 J. Taxation 218 (1970).

Trying to understand the various exempt organization provisions of the Internal Revenue Code is as difficult as capturing a drop of mercury under your thumb. There are currently 23 categories of exempt organizations under section 501(c) and 5 categories of organizations recognized as qualified donees of tax deductible contributions under section 170(c). Rarely is it clear that an organization would qualify only under one of the categories of section 501(c), and often it is clear that an organization would qualify under a number of the categories, even though a particular organization may have applied for and actually received its exemption letter under a single provision of section 501(c). For example, a unit of the Boy Scouts of America probably could qualify as an educational or charitable organization under section 501(c)(3), as a social welfare organization under section 501(c)(4), or as a social club under section 501(c)(7). Garden clubs apparently generally qualify under section 501(c)(7), but also may qualify under sections

---

[7]See also 1986 Stand. Fed. Tax Rep. (CCH) par. 1864.0103, at 23,162; 1986 Fed. Tax Coordinator 2d (RIA), vol. 15, par. K-3561, at 32,224.

501(c)(3), 501(c)(4), and 501(c)(5). See Rev. Rul. 66-179, 1966-1 C.B. 139. Parent-teacher associations have been qualified under both sections 501(c)(3) and 501(c)(4). See Rev. Rul. 61-153, 1961-2 C.B. 114; Rev. Rul. 54-434, 1954-2 C.B. 380.

At different points in time, a certain organization may qualify under one category of section 501(c), only to find itself, in later years, more suitably falling under another category. For example, prior to 1972, veterans' organizations were not separately treated in a specific paragraph of section 501(c). They apparently qualified for Federal tax-exempt status under section 501(c)(4), as social welfare organizations, and under section 501(c)(7), as social clubs. See H. Rept. 92-851, to accompany H.R. 11185 (Pub. L. 92-418)(1972); S. Rept. 92-1082 (1972), 1972-2 C.B. 713. In 1972, paragraph (19) of section 501(c) was added to the Code, giving veterans' organizations the benefit of a specific tax-exempt category for those veterans' organizations that chose to apply therefor. Existing veterans' organizations were not required to reapply for an exemption letter under section 501(c)(19). We thus have the situation today where some veterans' organizations have received their tax-exempt status from respondent under section 501(c)(4), some under section 501(c)(7), and some under section 501(c)(19).

Set forth below is the regulation under section 501(c)(19) which enumerates acceptable activities of veterans' organizations in order to qualify thereunder. Section 1.501(c)(19)-1, Income Tax Regs., provides as follows:

(c) *Exempt purposes.* In addition to the requirements of paragraphs (a)(1) and (b) of this section, in order to be described in section 501(c)(19) under paragraph (a)(1) of this section an organization must be operated exclusively for one or more of the following purposes:

(1) To promote the social welfare of the community as defined in section 1.501(c)(4)-1(a)(2),

(2) To assist disabled and needy war veterans and members of the United States Armed Forces and their dependents, and the widows and orphans of deceased veterans,

(3) To provide entertainment, care, and assistance to hospitalized veterans and members of the Armed Forces and to comfort their survivors,

(4) To carry on programs to perpetuate the memory of deceased veterans and members of the Armed Forces and to comfort their survivors,

(5) To conduct programs for religious, charitable, scientific, literary, or educational purposes,

(6) To sponsor or participate in activities of a patriotic nature,

(7) To provide insurance benefits for their members or dependents of their members or both, or

(8) To provide social and recreational activities for their members.

The activities described in paragraphs 1, 3, 4, and 6 apparently also could qualify as social welfare activities under section 501(c)(4) and the activities described in paragraphs 2, 3, and 5 could qualify as charitable activities under section 501(c)(3). Similarly, the activities described in paragraph 7 could qualify under section 501(c)(8), (c)(9), or (c)(21), and activities described in paragraph 8 could qualify under section 501(c)(7).

Veterans' organizations receive their charters from the Federal Government.[8] The Veterans of Foreign Wars of the United States, a post of which was the donee of the gift in question herein, was chartered in 1953. Its charter is found at 36 U.S.C. secs. 111 through 120 (1982). Section 113 thereof sets forth its organizational purposes as follows:

Sec. 113. Purposes of corporation

The purposes of this corporation shall be fraternal, patriotic, historical, and educational; to preserve and strengthen comradeship among its members; to assist worthy comrades; to perpetuate the memory and history of our dead, and to assist their widows and orphans; to maintain true allegiance to the Government of the United States of America, and fidelity to its Constitution and laws; to foster true patriotism; to maintain and extend the institutions of American freedom; and to preserve and defend the United States from all her enemies, whomsoever. (May 28, 1936, c. 471, sec. 3, 49 Stat. 1391.)

In considering this issue we recognize that it has been stated that veterans' organizations (including posts of the Veterans of Foreign Wars) serve "unique and compelling societal and governmental goals." *Taxation with Representation v. United States*, 585 F.2d 1219, 1224 (4th Cir. 1978), cert. denied 441 U.S. 905 (1979).

Having explained the overlap that often exists among various categories of exempt organizations under section

---

[8]For example, see the charters of the American Veterans of World War II, at 36 U.S.C. sec. 67 et. seq. (1982); Blind Veterans of World War I, at 36 U.S.C. sec. 81 et. seq.; The American Legion, at 36 U.S.C. sec. 41 et. seq.; Jewish War Veterans, at 36 U.S.C. sec. 911 et. seq.; Paralyzed Veterans of America, at 36 U.S.C. sec. 115.

501(c) and having reviewed some of the background concerning veterans' organizations, the relevant portions of the confusing statutory scheme must be analyzed in order to determine whether veterans' organizations can qualify as 50-percent organizations under section 170(b)(1)(A)(viii). As explained earlier, respondent asserts that even though a particular veterans' organization meets the financial tests of section 509(a)(2), as those tests are incorporated into section 170(b)(1)(A)(viii), it cannot qualify thereunder unless it received its tax-exempt status under section 501(c)(3). Petitioners assert that section 170(b)(1)(A)(viii) was intended to qualify as 50-percent organizations all exempt organizations (regardless of the particular provision of section 501(c) under which they claim their exempt status) that are eligible to receive tax-deductible contributions under section 170(c) to the extent such organizations meet the financial support tests of section 509(a)(2).

Prior to adoption of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, among the five types of organizations recognized as qualified donees of tax-deductible contributions there were six categories of exempt organizations, donations to which were deductible up to 30 percent of the donors' contribution base. Those six categories of organizations, with minor changes, survived the changes made by the Tax Reform Act of 1969 and are reflected today in the first six clauses of section 170(b)(1)(A). The percentage limitation for such organizations was increased to 50 percent of the donor's contribution base (see flush language of section 170(b)(1)(A)), and two additional categories of exempt organizations were added to those that would qualify as 50-percent organizations. See sec. 170(b)(1)(A)(vii) and (viii).

Before analyzing specifically what qualified donee organizations were added to the favored 50-percent group by clauses (vii) and (viii) of section 170(b)(1)(A), it is appropriate to recognize which qualified donee organizations were already in the 50-percent group under clauses (i) through (vi) of section 170(b)(1)(A). Those provisions provide generally that churches (see sec. 170(b)(1)(A)(i)), educational and medical institutions (see sec. 170(b)(1)(A)(ii) and (iii)), government-affiliated organizations that support educational institutions

(see sec. 170(b)(1)(A)(iv)), and governmental entities (see sec. 170(b)(1)(A)(v)), will fall into the 50-percent group.

Clause (vi) of section 170(b)(1)(A), the last of the six categories of exempt organizations in the 50-percent (then 30-percent) group under section 170(b)(1)(A) as it existed prior to the changes made by the Tax Reform Act of 1969, was a catchall provision intended to qualify as 50-percent (then 30-percent) organizations those exempt organizations described in section 170(c)(2) that receive a substantial part of their support from governmental entities or from the general public. Detailed and longstanding financial support requirements are set forth in section 1.170A-9(e), Income Tax Regs., describing the financial tests that an organization must satisfy in order to meet the requirements of section 170(b)(1)(A)(vi). The exempt organizations covered by clause (vi) (by its cross-reference to the exempt organizations referred to in section 170(c)(2)) are essentially the same exempt organizations referred to in section 501(c)(3) (i.e., religious, charitable, scientific, literary, educational, amateur sports, and animal care organizations). Petitioners argue that this coverage of section 501(c)(3) organizations in clause (vi) of section 170(b)(1)(A) is support for their position that clause (viii) of section 170(b)(1)(A), when it was added to the Code in 1969, was not intended to apply to section 501(c)(3) organizations, but that clause (viii) was intended as a catchall provision to include therein other exempt organizations that generally qualify for their exempt status under provisions of section 501(c) other than section 501(c)(3), if they are eligible to receive tax-deductible contributions under section 170(c) and if they meet the financial support requirements of section 509(a)(2).

The legislative history of the relevant provisions of the Tax Reform Act of 1969 is not helpful. The reason for the addition of clause (vii) to section 170(b)(1)(A) (namely, to qualify certain private foundations as 50-percent donee organizations) is explained. See S. Rept. 91-552 (1969), 1969-3 C.B. 423, 474; Conf. Rept. 91-782 (1969), 1969-3 C.B. 644, 653. No mention, however, is made anywhere in the legislative history as to the reason clause (viii) of section 170(b)(1)(A) was added to section 170(b)(l)(A), and no description or explanation was provided as to which exempt

organizations might~qualify thereunder as 50-percent donee organizations.

The Tax Reform Act of 1969 also made substantial changes to the tax treatment of private foundations. In explaining the definition of private foundations set forth in new section 509, the legislative history of that section explains the reason for the exception to private foundation status reflected in section 509(a)(2), as follows:

> The organizations which usually will be excluded from the definition of private foundations if they satisfy this provision include symphony societies, garden clubs, alumni associations, Boy Scouts, Parent-Teacher Associations, and *many other membership organizations.* [S. Rept. 91-552 (1969), 1969-3 C.B. 423, 461. Emphasis added.]

In light of the above quote and in light of the fact previously mentioned that, for example, symphony societies and garden clubs would qualify for exempt status generally under section 501(c)(4) or (c)(7), and further in light of the fact that veterans' organizations in 1969 also qualified for their exempt status under section 501(c)(4) or (c)(7), petitioners argue that it is clear that, at least in 1969, veterans' organizations were to be treated as one of the "many other membership organizations" which Congress had in mind in enacting the financial requirements of section 509(a)(2). Having reached that conclusion in the context of section 509, petitioners argue that veterans' organizations were among the organizations Congress intended to include in the category of publicly supported exempt organizations that, under section 170(b)(1)(A)(viii), would qualify as 50-percent organizations if they meet the financial support requirements of section 509(a)(2).

Respondent relies on the fact that veterans' organizations are the beneficiaries of a separate paragraph of section 501(c) under which they qualify for exempt status. As mentioned earlier, however, paragraph 19 of section 501(c) was not added to the Code until 1972, and it did not alter the exempt status many veterans' organizations had received in earlier years under other provisions of section 501(c). The legislative history of section 501(c)(19) makes it clear that that provision was enacted in 1972 solely to provide additional tax benefits to veterans' organizations,

not to detract therefrom.[9] Nothing in the legislative history of section 501(c)(19) suggests that veterans' organizations were to be treated differently than other exempt membership organizations under section 170 just because, beginning in 1972, veterans' organizations received special treatment under section 501(c)(19).

The resolution of this issue is not free from doubt and necessitates (whichever way it is decided) a difficult analysis of a vague statutory provision. We conclude that Congress did not intend in 1969 by its addition of clause (viii) to section 170(b)(1)(A) to allow organizations that qualify for exempt status under provisions of section 501(c) other than section 501(c)(3), and that are eligible to receive tax-deductible contributions under section 170(c), to qualify as 50-percent organizations even though they meet the financial support requirements of section 509(a)(2).

Clearly, if a veterans' organization qualifies as an organization described in section 501(c)(3), it would be among the types of broadly based, publicly supported exempt organizations that are intended to be exempt from private foundation treatment under section 509 if they meet the financial support requirements of section 509(a)(2). That fact, however, has no bearing upon whether veterans' organizations that do not qualify as section 501(c)(3) organizations can qualify as 50-percent donee organizations under section 170(b)(1)(A)(viii). Without some indication that Congress intended to do so, we cannot conclude that Congress intended to significantly expand the scope of 50-percent (then 30-percent) donee organizations under section 170(b)(1)(A). The statute is vague, and the legislative history provides no clue as to the intended scope of clause (viii) of section 170(b)(1)(A). On balance, we must conclude that had Congress intended to allow all organizations that qualify to receive tax-deductible donations under section 170(c) to qualify as 50-percent organizations under section 170(b)(1)(A)(viii) if they meet the financial support requirements of section 509(a)(2), the statute would have expressly so provided or, at the least, the legislative history under

---

[9]The additional tax benefits veterans' organizations received as a result of the enactment of sec. 501(c)(19) and other related provisions pertained to the treatment of life insurance premiums received by veterans' organizations as unrelated business income.

section 170(b)(1)(A)(viii) would have commented on that change.

We reiterate that under clauses (i) through (vi) of section 170(b)(1)(A) only government-related entities or section 501(c)(3) organizations may qualify as 50-percent organizations. Under clause (vii) of section 170(b)(1)(A), certain private foundations may so qualify. A holding in favor of petitioners herein would, in effect, constitute a holding that all of the other section 170(c) qualifying donee organizations potentially could qualify for the higher 50-percent limitation under section 170(b)(1)(A)(viii). We are not willing to recognize such an expansion of the benefits of section 170(b)(1)(A) in light of the ambiguous language of the statute and the lack of any clarification on this point in the legislative history of section 170(b)(1)(A)(viii).

Our conclusion herein is consistent with the Supreme Court dicta in *Regan v. Taxation with Representation of Washington, supra,* and with the weight of the tax law publications that have commented on the applicable rule. It is also consistent with a statement concerning the limitation applicable to veterans' organizations found in a report of the Staff of the Joint Committee on Taxation concerning the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494,[10] wherein donations of certain types of property to certain 20-percent organizations were increased to 30 percent of the donor's contribution base.

We note that the financial requirements an organization must meet under clause (vi) of section 170(b)(1)(A) are significantly different from the financial requirements an organization must meet under clause (viii) of section 170(b)(1)(A)(viii). Those differences rebut petitioners' argu-

---

[10]In explaining certain provisions of the Deficit Reduction Act of 1984, the Staff of the Joint Committee on Taxation made the following statement:

*Cash and ordinary-income property.*—The 20-percent limitation which applied under prior law for charitable contributions by individuals to private nonoperating foundations (and for certain other charitable contributions) is increased by the Act to 30 percent in the case of contributions of cash and ordinary-income property. * * *

*The other charitable contributions which had been subject to the 20-percent limitation* under prior law were contributions to or for the use of (a) *certain organizations of war veterans and their auxiliary units,* (b) certain fraternal organizations operating under the lodge system, if the gift is used exclusively for certain exempt purposes, and (c) certain nonprofit cemetery companies, and contributions for the use of public charities or other eligible donees (sec. 170).

[Staff of Joint Comm. on Taxation, General Explanation of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494 at 667-668. (J. Comm. Print 1984). Emphasis added.]

ment that the coverage of section 501(c)(3) organizations in clause (vi) of section 170(b)(1)(A) requires us to conclude that clause (viii) of section 170(b)(1)(A) was intended primarily to reach organizations other than section 501(c)(3) organizations. Clearly, many section 501(c)(3) organizations may not meet the financial requirements of section 170(b)(1)(A)(vi). The purpose of adding clause (viii) to section 170(b)(1)(A) apparently was to enable precisely those section 501(c)(3) organizations to still qualify as 50-percent donee organizations if they meet the financial requirements of section 509(a)(2).

Petitioners point to other references in section 170 to various provisions of section 509. In section 170(b)(1)(D) (current section 170(b)(1)(E)), for example, three references are made to section 509. Two of those references are expressly to section 509(a) and one is expressly to section 509(a)(3).[11] In light of those specific references to the different provisions of section 509, petitioners argue that Congress was aware of a difference between a reference to "section 509(a)" and a reference to section "509(a)(2) or (3)" and that when Congress referred, in section 170(b)(1)(A)(viii), specifically to section 509(a)(2) or (3), it did not intend

---

[11]The text of sec. 170(b)(1)(D) (currently found in sec. 170(b)(1)(E)) is as follows:

(D) CERTAIN PRIVATE FOUNDATIONS.—The private foundations referred to in subparagraph (A)(vii) and subsection (e)(1)(B) are—

       \*       \*       \*       \*       \*       \*       \*

(ii) any other private foundation (as defined in section 509(a)) which, not later than the 15th day of the third month after the close of the foundation's taxable year in which contributions are received, makes qualifying distributions (as defined in section 4942(g), without regard to paragraph (3) thereof), which are treated, after the application of section 4942(g)(3), as distributions out of corpus (in accordance with section 4942(h)) in an amount equal to 100 percent of such contributions, and with respect to which the taxpayer obtains adequate records or other sufficient evidence from the foundation showing that the foundation made such qualifying distributions, and

(iii) a private foundation all of the contributions to which are pooled in a common fund and which would be described in section 509(a)(3) but for the right of any substantial contributor (hereafter in this clause called "donor") or his spouse to designate annually the recipients, from among organizations described in paragraph (1) of section 509(a), of the income attributable to the donor's contribution to the fund and to direct (by deed or by will) the payment, to an organization described in such paragraph (1), of the corpus in the common fund attributable to the donor's contribution; but this clause shall apply only if all of the income of the common fund is required to be (and is) distributed to one or more o;rganizations described in such paragraph (1) not later than the 15th day of the third month after the close of the taxable year in which the income is realized by the fund and only if all of the corpus attributable to any donor's contribution to the fund is required to be (and is) distributed to one or more of such organizations not later than one year after his death or after the death of his surviving spouse if she has the right to designate the recipients of such corpus.

thereby to incorporate into that reference the introductory language of section 509(a).

We note, however, that even those references in section 170(b) to the provisions of section 509 are not uniform. The first reference is simply to "section 509(a)." The second reference is to "section 509(a)(3)." The third reference, however, is expressly to "paragraph (1) of section 509(a)," suggesting to us a more narrow reference than the reference to "section 509(a)(3)."

For the reasons set forth above we conclude that charitable contributions to tax-exempt veterans' organizations do not qualify for the 50-percent limitation of section 170(b)(1)(A)(viii) even though they meet the financial support requirements of section 509(a)(2). In light of our holding, petitioners' contribution in 1979 to the Southgate Post is governed by the limitations of section 170(b)(1)(B).

*Decision will be entered for the respondent.*

Reviewed by the Court.

STERRETT, SIMPSON, GOFFE, CHABOT, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, JACOBS, WRIGHT, PARR, and WILLIAMS, *JJ.*, agree with this opinion.

WILBUR, NIMS, and GERBER, *JJ.*, did not participate in the consideration of this case.

---

KÖRNER, *J.*, concurring: I agree with the result which the majority reaches in this case and, in general, with what is said in the majority opinion. There are two further points which I would make, however, which may aid in clarifying the matter.

First. I think we should make it clear that we are *not* holding, as apparently contended by respondent, that an organization such as the V.F.W. Post (Southgate Post) here must have actually *received* its exemption under section 501(c)(3), in order to qualify under section 170(b)(1)(A)(viii), but only that such organization must *qualify* under section 501(c)(3). As the majority correctly points out, in many cases it is possible for an organization to qualify under

more than one of the subsections of section 501(c). In the instant case, it is clear that Southgate Post qualifies under section 501(c)(19), but it is not at all clear that it also qualifies under section 501(c)(3). For example, as an organization exempt under section 501(c)(19), Southgate Post can provide insurance benefits to its members and dependents, as well as social and recreational benefits. See sec. 1.501(c)(19)-1(c)(7) and (8), Income Tax Regs. It is not at all clear that such activities would be permitted to a section 501(c)(3) organization.

Additionally, as an organization exempt under section 501(c)(19), Southgate Post does not seem to be subject to the severe limitations with regard to lobbying activity which are imposed in the case of section 501(c)(3) organizations. See secs. 501(c)(3); 501(h). Without reference to Southgate Post, we think it is a matter of common knowledge that veterans' organizations from time to time engage in extensive lobbying activities, both at the State and Federal level, in connection with matters of concern to them.

Second. I think that proper statutory construction requires that the introductory language of section 509(a) be read as part of the description of all the organizations further described in the various numbered subsections of section 509(a). In other words, the "general rule" is that all such organizations, in addition to their other characteristics, must also be section 501(c)(3) organizations. That this is correct is made plain to me by the last sentence of section 509(a), which states:

*For purposes of paragraph (3)*, an organization described in paragraph (2) shall be deemed to include an organization described in section 501(c)(4), (5), or (6) which would be described in paragraph (2) if it were an organization described in section 501(c)(3). [Emphasis supplied.]

Here, Congress made an explicit exception to the "general rule" that all the organizations described in section 509(a) had also to be section 501(c)(3) organizations. It did so with great particularity and with specific limitations, and made the exception applicable only with respect to organizations qualifying under *section 509(a)(3)*. Petitioners here make no contention that Southgate Post should qualify under section 509(a)(3), but rather under section 509(a)(2), and the specific

exception to the general rule of the statute thus does not apply to Southgate Post. Inclusio unius est exclusio alterius.

Thus, I conclude that Congress knew what it was doing and intended what it said. There being no showing in this record that Southgate Post qualifies as a section 501(c)(3) organization, petitioners' attempt to qualify it as a section 509(a)(2) organization pursuant to the provisions of section 170(b)(1)(A)(viii) must fail.

STERRETT, CHABOT, PARKER, WHITAKER, HAMBLEN, COHEN, JACOBS, WRIGHT, and PARR, *JJ.*, agree with this concurring opinion.