**BELLA LEWITZKY DANCE FOUNDATION, Plaintiff,**

v.

**John E. FROHNMAYER, et al., Defendants.**

**NEWPORT HARBOR ART MUSEUM, Plaintiff,**

v.

**NATIONAL ENDOWMENT FOR THE ARTS, et al., Defendants.**

**Nos. CV 90–3616 JGD, CV 90–5142 JGD.**

United States District Court, C.D. California.

Jan. 9, 1991.

Anthony Russo, Laura A. Vossman, Morgan, Lewis & Bockius, Los Angeles, Cal., for plaintiff, No. CV 90–3616 JGD.

Michael Sitcov, Dept. of Justice, Civil Div., Washington, D.C., for defendants, No. CV 90–3616 JGD.

James V. Selna, O'Melveny & Myers, Newport Beach, Cal., for plaintiff, No. CV 90–5142 JGD.

Mark W. Batten, Dept. of Justice, Civil Div., Washington, D.C., for defendants, No. CV 90–5142 JGD.

## ORDER GRANTING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

DAVIES, District Judge.

On December 17, 1990, the Court heard oral argument on cross-motions for summa-

ry judgment in each of the above-captioned cases. The Court HEREBY GRANTS plaintiffs' motions for summary judgment and DENIES defendants' motions for summary judgment.

The cross-motions for summary judgment made in these two actions have been consolidated. In each case the named defendants are the National Endowment for the Arts ("NEA"), an independent agency of the United States and John E. Frohnmayer, Chairperson of said agency. Bella Lewitzky Dance Foundation is the plaintiff in case CV 90–3616 JGD, and Newport Harbor Art Museum is the plaintiff in case CV 90–5142 JGD. Facts common to both cases abound as do common questions of law. For this reason, the Court has consolidated the two actions for these limited purposes pursuant to Fed.R.Civ.P. 42(a).[1]

## FACTS

### The Parties

Plaintiff Bella Lewitzky Dance Foundation ("Foundation") is a nonprofit corporation which does business as the Lewitzky Dance Company. The Foundation was incorporated in California in 1968. It creates and performs modern dance works throughout the United States and foreign countries. Bella Lewitzky is the Artistic Director of the company. She has been actively involved in modern dance for over 50 years. The Foundation has been a recipient of NEA grants since 1972, and in that time has been awarded more than $1,400,000. The grants, and funds provided by private donors, have been used by the Foundation to support the Dance Company.

Plaintiff Newport Harbor Art Museum ("Museum") is a nonprofit corporation founded in 1963 to promote the visual arts. The Museum maintains a permanent collection and sponsors and presents temporary exhibitions which are shown at its museum

---

1. On October 15, 1990, in the Bella Lewitzky case only, the Court heard defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) & (6). On October 23, 1990, the Court denied that motion.

in Newport Beach and also loaned to other museums around the country. Thomas H. Neilsen is the President of the Museum and a member of its board. During the past 18 years the Museum has received fifty six NEA grants totaling $1,263,020.

Defendants are the National Endowment for the Arts ("NEA") and its Chairperson, John E. Frohnmayer. The NEA is an independent agency of the United States. By enacting 20 U.S.C. § 951, Congress created the NEA to provide support for the arts. The Chairperson, with the advice of the National Council on the Arts, is charged with establishing and carrying out a program of financial support for specified programs, projects, and productions. § 954(c)(1)–(8).

The Court permitted four groups to file *amicus curiae* briefs. These groups are: (1) Theatre Communications Group, 162 nonprofit theatres and 69 concerned individuals; (2) the Rockefeller Foundation; (3) Theatre & Arts Foundation of San Diego County; and (4) Coalition for Freedom of Expression, and 39 concerned organizations and individuals.

*The Grant Process*

At all times relevant to this litigation, the procedure to obtain a grant from the NEA began by the filing of an application. The application was generally submitted in the fiscal year prior to the year in which the funding was required. The applicant was required to describe the project or production for which the funds would be used, summarize the estimated costs of the project, specify the total amount requested from the NEA, and provide data regarding the grantee's overall fiscal activity, including information about private sources of funding and other revenues. If approved for a grant, the applicant would then submit a "Request for Advance or Reimbursement" in order to obtain any of the proceeds of the award.

On October 23, 1989, Congress amended the statutory framework within which the NEA operates by enacting Section 304 of the Department of the Interior and Related Agencies Appropriation Act of 1990 (P.L. 101–121, 103 Stat. 701, 741). § 304(a) of the Act provides:

"None of the funds authorized to be appropriated for the National Endowment for the Arts ... may be used to promote, disseminate, or produce materials which in the judgment of the National Endowment for the Arts ... may be considered obscene, including but not limited to, depictions of sadomasochism, homoeroticism, the sexual exploitation of children, or individuals engaged in sex acts and which, when taken as a whole, do not have serious literary, artistic, political or scientific value."

To implement this Congressional directive, the NEA added a certification requirement to the "Request for Advance or Reimbursement". The new section of this form required recipients to certify to compliance with certain "General Terms and Conditions for Organizational Grant Recipients". Paragraph Two of the Terms and Conditions contained language drawn directly from § 304(a), described above. Thus, for any of the grant funds to be released, the grantee was required to certify in advance that none of the funds awarded would be used "to promote, disseminate, or produce materials which in the judgment of the NEA ... may be considered obscene".

*Plaintiffs' Experience With The Grant Process*

On January 12, 1989, the Foundation applied to the NEA for a 1990–1991 grant. The grant was requested for the purpose of providing partial salary support to the Foundation, and thus assisting the Foundation in developing new works, upgrading its repertoire, and aiding the professional development of the Foundation's artists.

After enactment of § 304, the NEA awarded the Foundation a grant of $72,000. The Foundation was notified of the award on January 4, 1990. Accompanying the award letter was a document setting forth terms and conditions applicable to NEA grant recipients ("Terms and Conditions"). As outlined above, this document included the condition derived from § 304(a) in its Paragraph Two. Paragraph Five of the

Terms and Conditions stated that "submission of a request for funds constitutes agreement to comply with all terms and conditions."

On May 15, 1990, the Foundation submitted to the NEA a "Request for Advance or Reimbursement" for partial payment of $15,000. As noted, the Request for Advance or Reimbursement required the grantee to certify to compliance with all NEA terms and conditions. Darlene Neel, the Foundation's company manager, completed the certification, but crossed out and initialed Paragraph Two of the Terms and Conditions, indicating the Foundation's refusal to be bound by that condition.

On May 29, 1990, the Foundation received the $15,000 it had requested. However, on that same day the Foundation also received a letter from Julianne Ross Davis, General Counsel to the NEA. This letter informed the Foundation that none of the terms of the NEA grant were optional, that the Foundation could not advise the NEA as to which terms and conditions it did not agree to accept, and that the Foundation was bound by all of the Terms and Conditions as stated in the grant award letter if it wished to use the grant funds awarded to it.[2] In response to Ms. Davis' letter, the Foundation segregated the $15,000 it had already received. Those funds remain segregated and unspent. The balance of the Foundation's grant also remains undistributed.

The Museum's experience in the grant process was substantially similar. During the 1990 fiscal year, the Museum submitted grant applications for four projects. The NEA subsequently approved grants totaling $100,000 for all four projects. However, on May 24, 1990, when faced with the certification process described above as a prerequisite to obtaining the grant proceeds, the Museum's Board of Trustees resolved not to comply with Paragraph Two.[3] Because it refused to make the required certification, the Museum received no portion of the grants for which it had been approved.

*The NEA's Policy Statements*

In July, 1990, the NEA issued and sent to grantees a "Statement of Policy and Guidance for the Implementation of Section 304". The policy statement provided, *inter alia*, that the Terms and Conditions would continue to contain the language of § 304, and that the NEA would essentially rely on the standard of *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), as a basis for making determinations regarding obscenity.[4]

The July, 1990 Statement of Policy also set out "Procedures for Implementing Section 304". One such procedure provided that once a grant has been approved, if the NEA had reason to believe, through NEA sources or otherwise, that the grantee is violating § 304, the NEA would advise the grantee in writing. The grantee would then have 30 days within which to submit "written justifications" of its work, after which time the NEA would determine whether the project violates § 304. Further, the Statement of Policy provided that if the NEA did determine that the project violated § 304, the NEA would recoup the grant pursuant to its civil and administrative remedial powers. *See* Decl of Bella Lewitzky, Ex. G.

In a Supplemental Statement of Policy, effective September 18, 1990, the NEA stated that "obscenity" for the purposes of § 304 means "the sort of 'patently offensive representations or descriptions of that

---

2. *See* Decl. of Bella Lewitzky, Ex. F.

3. At the time, the Museum had only been notified of the award of one of the grants it ultimately would receive.

4. Section 2(a) of the Statement of Policy states that the NEA considers to be "obscene" art work which:
   1) when taken as a whole, the average person, applying contemporary community standards,

would find appeals to the prurient interest; 2) depicts or describes sexual conduct in a patently offensive way; and 3) taken as a whole, lacks serious literary, artistic, political, or scientific value. The Statement of Policy asserts that this is identical to the definition established in *Miller*.
*See* Decl. of Bella Lewitzky, Ex. G.

specific hard core sexual conduct given as examples in *Miller v. California.'* " [5]

## DISCUSSION

### Standing

Though the Court addressed this issue when assessing the merits of defendants' motion to dismiss in the Bella Lewitzky case, the sufficiency of plaintiffs' standing must now be revisited because the Supreme Court has classified lack of standing as a defect in the court's subject matter jurisdiction. *Bender v. Williamsport Area School District*, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). And Fed.R.Civ.P. 12(h)(3) provides that "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." To this same end, the Ninth Circuit has stated: "It is ... error to rule on a summary judgment—or any other matter going to the merits— where a court determines that it lacks jurisdiction over the subject matter." *O'Donnell v. Wien Air Alaska, Inc.*, 551 F.2d 1141, 1145, n. 4 (9th Cir.1977). The NEA contends that the evidence developed in the discovery process since the denial of its motion to dismiss shows that the plaintiffs fail the injury and redressability tests of the three-part standard used to assess standing.

■■■ *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 506 (9th Cir.1988), provides the Ninth Circuit position on the issue of plaintiff's standing:

"At an 'irreducible minimum' Article III standing requires that a plaintiff show (1) 'that he personally has suffered some actual or threatened injury' as a result of defendant's conduct, (2) that the injury 'fairly can be traced to the challenged action' and (3) that the injury is likely to be redressed by a favorable decision.' *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)."

Moreover, the injury must not be abstract, conjectural, or hypothetical. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Further, a plaintiff is said to have "no standing to complain simply that the Government is violating the law." *Id.* at 755, 104 S.Ct. at 3326.

■■■ Applying the *Bullfrog Films* three-part test, plaintiffs have established that no genuine issue exists as to whether they have suffered actual injury as a result of the allegedly unconstitutional certification requirement. There is no dispute that the plaintiffs were awarded NEA grants on the basis of artistic merit. Nor is there any dispute that they did not receive the benefits of these grants. The Foundation did not receive the $72,000 grant for which it was approved, solely because it refused to sign the certification.[6] Similarly, the Museum did not receive its $100,000 grant. The loss of these funds is indeed injury in fact and is sufficient to establish that each of these organizations has been adversely affected by the withholding of the funds. *See Arlington Heights v. Metropolitan Housing Develop. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (economic injury of corporate developer of racially integrated low-income housing barred by challenged ordinance was sufficient personal stake to establish standing). *See also Barlow v. Collins*, 397 U.S. 159, 163–164, 90 S.Ct. 832, 836, 25 L.Ed.2d 192 (1970).

However, defendants contend that plaintiffs lack actual injury. They argue that plaintiffs lack standing because § 304 has not been applied to them. In support, defendants argue that Bella Lewitzky, in her deposition, at p. 19 & 60, testified that the Foundation would willingly sign the certification of compliance with the Terms and Conditions imposed by the NEA except for

---

5. *See* Memorandum of Amicus Curiae Rockefeller Foundation, Ex. G.

6. Though the Foundation did receive a $15,000 disbursement, it is not disputed that this amount has been segregated and remains un-

spent. Hence, the Foundation has effectively been denied its use as a result of the decision not to comply with the certification requirement.

an objection to one provision—that which deals with the obscenity ban. Defendants contend that this proves that plaintiffs are not attacking the certification condition, but rather a constitutional flaw in one term of the required certification. From there, Defendants conclude and argue that plaintiffs are in fact facially challenging § 304, the section from which the offending condition is drawn. Thus, defendants argue that plaintiffs lack standing because they have failed to demonstrate that the proscription on obscenity in § 304 has been, or is likely to be, applied to them. *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (plaintiffs lacked standing to challenge IRS procedures denying tax-exempt status because they themselves had not been denied equal treatment); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–167, 92 S.Ct. 1965, 1968, 32 L.Ed.2d 627 (1972) (standing denied because plaintiff did not allege that he had ever been denied membership in a club because of that club's racially discriminatory policies); *Ripplinger v. Collins*, 868 F.2d 1043, 1047 (9th Cir.1989) (actual injury to support standing requires "reasonable threat of prosecution for conduct allegedly protected by the Constitution").

Defendants' argument fails as a matter of logic. The deposition testimony does not prove one way or the other that the Foundation's claim is a facial challenge to § 304. The cited deposition testimony only proves that the certification requirement contained a condition to which the Foundation would not agree to be bound. Because plaintiffs have only challenged the certification requirement in these suits, the Court is unable to determine whether or not plaintiffs would in fact object to the obscenity condition if they were not required in advance to accept the condition and be bound by it.

Moreover, one plaintiff plainly states that its objection is not with the underlying statute, § 304. The Museum states flatly that "this motion is directed solely to the NEA's certification requirement, and the Museum abandons, without prejudice, any

contention that § 304 ... is unconstitutional or otherwise unenforceable." [7] The record is quite unequivocal, and therefore, the Court finds that plaintiffs' challenge is to the advance certification requirement and not to the statute.

Furthermore, plaintiffs have established that no genuine issue exists as to whether the certification requirement has actually been applied to them. Both plaintiffs were requested to sign the certification as a prerequisite to receiving disbursement of their grants. Accordingly, defendants' citations to *Allen v. Wright, Moose Lodge No. 107 v. Irvis*, and *Ripplinger v. Collins* are distinguishable. Therefore, the Court finds that Ms. Lewitzky's deposition testimony cited by defendants does not effect standing. Plaintiffs have adequate injury to bring this action.

As to the second prong of the *Bullfrog Films* test, no genuine issue exists as to the fact that the injury—the loss of grant proceeds—is directly traceable to the challenged action, i.e. the certification requirement. Defendants are withholding plaintiffs' grant proceeds as a direct result of plaintiffs' refusal to sign the certification.

Finally, the Court finds that if the challenged certification process were struck down, plaintiffs' injury would be sufficiently redressed. Plaintiffs declare that if the certification requirement were struck down, they would comply with the balance of the terms and conditions imposed, and funding could commence. Accordingly, the *Bullfrog Films* three-part test is satisfied and plaintiffs' standing established.

However, defendants raise the issue of redressability as their second challenge to plaintiffs' standing. They assert that so long as § 304 is not attacked, and is thereby not stricken on constitutional grounds, plaintiffs will continue to face the same potential injury, i.e. loss of grant proceeds, even if the certification requirement is struck down. The NEA points out that it may use § 304(a) directly to block grant

---

7. Newport brief in support of summary judgment, p. 2. *See also* plaintiff Bella Lewitzky

Dance Foundation Complaint, para. 3 *et seq.*

disbursement, or require grant repayment, should the agency deem a grantee's work to be obscene. Therefore, a decision in plaintiffs' favor would not redress their alleged injury, and the third criterion of the *Bullfrog Films* test would be unfulfilled.

This argument is not persuasive. A statute placing even unconstitutional limitations upon subsidy usage causes injury separate and distinct from that injury caused by the vagueness of an advance certification requirement. The difference can be illustrated by examining the procedural recourse available in each instance.

First, if the plaintiffs refuse to sign the certification, they simply are cut off indefinitely from the grant awarded them on the basis of merit. No administrative alternative is available. Moreover, the NEA has definitively stated, in communications with these grantees, that signing the certification is a nonnegotiable rule; a take it or leave it proposition.[8] To the contrary, striking down the certification requirement as unconstitutional makes plaintiffs' grant proceeds immediately available to them. If the NEA subsequently sought forfeiture or repayment of these proceeds, grantees would be entitled to some form of administrative review of the NEA decision[9], or ultimately, recourse to the courts for a judicial determination. Therefore, the nature of the injuries in the two situations is distinct. Accordingly, a favorable decision for the plaintiffs in the instant action would redress a distinct injury and the third criterion of the *Bullfrog Films* test is satisfied.

In sum, plaintiffs have established that they have adequate Article III standing to pursue the instant action.

### Standard for Summary Judgment

■ The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *U.S. v. Wilson*, 881 F.2d 596, 601 (9th Cir.1989) *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The non-moving party must then offer evidence of such a caliber that a fair minded jury could return a verdict for the non-moving party on the evidence presented. *Id. citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Moreover, "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, in assessing the nonmoving parties' presentation, a court must consider the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513 (1986).

**8.** "[T]he endowment is required to inform you of all Federal statutes, rules and regulations affecting the award of grant funds for which you have applied. I must advise you, further, that none of the stated terms or conditions is optional; that is, you may not advise us as to which ones you agree to accept and which ones you do not. The laws exist by Congressional mandate and upon receipt and acceptance of any federal funds, you are bound by all of the terms and conditions as stated in your grant award letter." Letter from Julianne Ross Davis to Bella Lewitzky Dance Foundation, May 29, 1990. *See* Decl. of Bella Lewitzky, Ex. F.

**9.** *See* NEA policy statement, July 11, 1989, attached as Ex. G to Decl. of Bella Lewitzky. That statement provides, in part, that:

"If the Endowment has reason to believe a grantee is violating section 304 after a grant is approved ..., the Endowment will write a letter to the grantee notifying it that it may be in violation of section 304 and that a written justification of the project and its compliance with section 304 must be submitted within thirty (30) days. The Endowment will then review the written submission (or if none is received, the available information) and determine whether the project violates section 304. If the Endowment finds that such a violation has occurred, the Endowment will recoup the grant money pursuant to its civil and administrative remedial powers."

The Court is mindful that the mere fact that the parties make cross-motions for summary judgment does not necessarily mean that there is no disputed issues of material fact or that the Court is necessarily permitted to render judgment in favor of one side or the other. *Starsky v. Williams*, 512 F.2d 109, 112 (9th Cir.1975). Nonetheless, summary judgment motions are fitting in these cases because the Court can discern no factual disputes that would require a trial.

*Constitutional Violations*

1. Fifth Amendment Due Process Claims

■ Plaintiffs contend that the certification they are required to make contains provisions on the subject of obscenity that are unconstitutionally vague, and thus violate the Fifth Amendment Due Process Clause. The Ninth Circuit has stated that *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), is "an authoritative articulation of the vagueness doctrine, representing a synthesis of past teachings." *U.S. v. Hutson*, 843 F.2d 1232, 1235 (9th Cir.1988). *Grayned* explains the vagueness doctrine as follows:

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abuts upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of those freedoms.' Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked."

*Grayned*, 408 U.S. at 108–109, 92 S.Ct. at 2298–99. "A statute may be void for vagueness if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes." *U.S. v. Gilbert*, 813 F.2d 1523, 1526 (9th Cir.1987).

Plaintiffs argue that unconstitutional vagueness arises because the determination of obscenity is in the judgment of the National Endowment for the Arts. Plaintiffs complain that they are left to speculate about how the NEA will assess obscentiy. In response, the NEA argues that it has taken the policy position that it will rely on the well established standard of *Miller v. California*, 413 U.S. 15, 24–25, 93 S.Ct. 2607, 2614–15, 37 L.Ed.2d 419 (1973), when applying the obscenity ban found in the certification requirement.[10] Further, the NEA contends that the *Miller* definition cannot be vague as a matter of law.[11] However, the Court finds that the adoption of the *Miller* standard by the NEA does not cure the vagueness arising from the fact that the obscenity determination has

10. *Miller* limited the scope of governmental regulation of obscenity "to works which depict or describe sexual conduct ... specifically defined by the applicable state law, as written or authoritatively construed," 413 U.S. at 24, 93 S.Ct. at 2614–15, and established the following "basic guidelines" for determining whether depictions or descriptions of sexual conduct qualify as obscene:

"(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest' ... (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." 413 U.S. at 24, 93 S.Ct. at 2614–15.

11. *See* Defendants' brief in opposition to plaintiffs' motion for summary judgment at p. 19, *citing Hamling v. United States*, 418 U.S. 87, 113–114, 94 S.Ct. 2887, 2905–06, 41 L.Ed.2d 590 (1974).

been left to the judgment of the National Endowment for the Arts.

The NEA's vow to rely on *Miller* cannot cure the vagueness for two essential reasons. First, the NEA policy statements promising to rely on *Miller* are not legally binding on the agency. *Telecommunications Research and Action Center v. FCC*, 800 F.2d 1181, 1186 (D.C.Cir.1986) ("a general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemaking or adjudications"); *Vietnam Veterans v. Secretary of the Navy*, 843 F.2d 528, 537 (D.C.Cir.1988) ("the agency remains free in any particular case to diverge from whatever outcome the policy statement or interpretive rule might suggest"). The NEA may change or modify its policy at will.

Second, the NEA cannot provide the procedural safeguards outlined in *Miller*. In upholding the authority of a state government to pursue prosecutions for disseminating obscene materials, the Supreme Court in *Miller* focused on three key procedural safeguards. First, there must be a statute specifically defining the sexual conduct the depiction or description of which is forbidden, so that a potential violator has "fair notice" of what he can and cannot do. 413 U.S. at 24–25, 28, 93 S.Ct. at 2614–2615, 2617. Second, there must be a full adversarial trial. 413 U.S. at 27, 93 S.Ct. at 2616. Third, there must be a jury of citizens applying community standards for obscenity. 413 U.S. at 31–35, 93 S.Ct. at 2618–2620.

Even if the Court were to make the generous assumption that the NEA could satisfy the first two procedural prerequisites [12], the third safeguard is unobtainable by an administrative agency of the federal government. Simply stated, the NEA is a national-level agency that, by hypothesis, is incapable of applying varying community standards for obscenity. Accordingly,

even when the NEA promises to apply *Miller*, how it will endeavor to do so in a grantee's particular local community is a matter about which grantees may only "speculat[e] at their peril." *Whitehill v. Elkins*, 389 U.S. 54, 58–59, 88 S.Ct. 184, 186, 19 L.Ed.2d 228 (1967). The NEA has not even attempted, to date, to make any announcement which might suggest how they intend to address this "community standards" issue.

Therefore, the Court finds that the NEA certification requirement is unconstitutionally vague because it leaves the determination of obscenity in the hands of the NEA.

### 2. The First Amendment Claims

■ Plaintiffs contend that the vagueness of the certification requirement, discussed above, violates the First Amendment as well as the Fifth Amendment because it creates a chilling effect on speech. As stated by *amicus* Rockefeller Foundation, "a conscientious applicant who takes the certification seriously is thus compelled to avoid undertaking any project that might even arguably violate" the vague certification requirement regarding obscenity. *Amicus* brief at p. 12. In other words, plaintiffs claim that the vagueness of the statute forces grant recipients to avoid even coming close to the line between what is merely provocative and what is proscribed. Put still another way, *amicus* Rockefeller Foundation argues that,

> "because NEA applicants must certify that they will not violate Section 304's vague restrictions, many major legitimate artistic projects will not be undertaken either for fear of violating the vague terms of the certification, or even merely for fear of becoming embroiled in a dispute with the NEA over an accusation that the work of art in question might violate the certification."

Rockefeller *amicus* brief at p. 54.

The seminal case on the subject of chilling effect is *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d

---

**12.** The Court views these assumptions as generous because, for example, it is certain that the NEA cannot provide a jury trial, though the prospect remains open that it might develop some administrative equivalent.

1460 (1958). In the context of analyzing an oath requirement, the *Speiser* court held that the effect of a vague statute will be to cause the oath takers to "steer far wider of the unlawful zone" than if the boundaries of the forbidden area were clearly marked. Similarly, *Baggett v. Bullitt*, 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d 377 (1964), in discussing a vague oath required of public employees, held that "those with a conscientious regard for what they solemnly swear or affirm" can only avoid the threatened sanction "by restricting their conduct to that which is unquestionably safe." In the Supreme Court's view, "free speech may not be so inhibited." *Id. See also Cramp v. Board of Public Instruction*, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961).

The chilling effect on these two plaintiffs arising from the NEA's vague certification requirement is unmistakably clear. The creative expression of the plaintiff Dance Foundation would necessarily be tempered were it to sign the certification and then take seriously its pledge not to promote, disseminate, or produce anything that the NEA in its judgment might find obscene. Similarly, in compiling works for inclusion in the various exhibits for which it obtained NEA grants, the plaintiff Museum would have to continually moderate its selection decisions with a view toward steering clear of what might strike the NEA as obscene. The Court finds that because the certification requirement includes unconstitutionally vague provisions, it also violates grantees First Amendment rights by causing a chilling effect on their artistic expression.

In addition, the chilling effect caused by the certification provisions is exacerbated by the practical realities of funding in the artistic community. Plainly stated, the NEA occupies a dominant and influential role in the financial affairs of the art world in the United States. Because the NEA provides much of its support with conditions that require matching or co-funding from private sources [13], the NEA's funding involvement in a project necessarily has a multiplier effect in the competitive market for funding of artistic endeavors. *Amicus* Theatre Communications Group points out that, "most non-federal funding sources regard the NEA award as an imprimatur that signifies the recipient's artistic merit and value. NEA grants lend prestige and legitimacy to projects and are therefore critical to the ability of artists and companies to attract non-federal funding sources." Grant applicants rely on the NEA well beyond the dollar value of any particular grant. As the NEA has made no showing to the contrary, the Court is inclined to agree.

The NEA argues that the certification requirement causes no chilling effect. It postulates that the deposition testimony of Bella Lewitzky demonstrates that her subjective chill is based on incorrect understanding of the law and thus is not constitutionally cognizable. *Polykoff v. Collins*, 816 F.2d 1326, 1340 (9th Cir.1987), *citing Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972). Defendants argue that in her deposition, Ms. Lewitzky testified that the vagueness of § 304(a) is in its use of the term "obscene" and the phrase "including but not limited to" which immediately follows it. Lewitzky Dep. at 60–62. Defendants add that when directed to the *Miller* definition and the examples of sexual conduct provided in that opinion, Ms. Lewitzky persisted in asserting that § 304(a) is vague. *Id.* at 61–67.

In view of the Court's finding that the certification requirement is unconstitutionally vague in spite of the NEA policy statements that *Miller* will be the controlling standard, the excerpt from Ms. Lewitzky's deposition testimony does not reflect any misunderstanding of the law. In fact, her statement is quite consistent with the Court's view that the NEA's vow to rely on *Miller* does not cure the vagueness of the obscenity portion of the certification requirement. Accordingly, *Polykoff* is distinguishable and the chilling effect described above is indeed constitutionally cognizable.

---

**13.** For example, 20 U.S.C. § 954(e) generally requires that NEA funding not exceed fifty per cent of the total cost of a grantee's project or production.

### 3. The Subsidy Decision Defense

Defendants attempt to supersede all of the above analysis by arguing that the obscenity ban in the certification requirement does not violate the First or Fifth Amendments because "it is nothing more than a governmental decision not to subsidize the exercise of particular protected expression." Defendants Brief at p. 10. Defendants argue that this case should be analyzed in accordance with the line of cases which holds that the government has no constitutional obligation to subsidize an activity merely because it is constitutionally protected. *E.g. Cammarano v. U.S.*, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959) (government may deny tax deductions for amounts expended for the promotion or defeat of legislation); *Regan v. Taxation With Representation in Washington*, 461 U.S. 540, 549, 103 S.Ct. 1997, 2002, 76 L.Ed.2d 129 (1983) (government may deny tax-exempt status to a group engaged in lobbying); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (government may elect to provide payments to Medicaid recipients for childbirth, but not for nontherapeutic abortions); *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (government may choose not to subsidize medically necessary abortions, although it opted to subsidize medically necessary services generally); and *Webster v. Reproductive Health Services*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (state may opt to ban use of public employees and facilities for performance of nontherapeutic abortions).

In response, the plaintiffs would characterize these cases as properly analyzed under the line of cases which holds that the government may not impose an unconstitutional condition on the exercise of a fundamental right. *E.g. Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (government may not deny a benefit for reasons that infringe the beneficiary's interest in freedom of speech).

The Second Circuit outlined the debate now facing this Court as follows:

"A policy of not subsidizing the exercise of a fundamental right differs in an important respect from a prohibition on the exercise of a fundamental right, *see e.g. Boos v. Barry*, 485 U.S. 312 [108 S.Ct. 1157, 99 L.Ed.2d 333] (1988), or from the imposition of an unconstitutional condition on the exercise of a fundamental right, *see Perry v. Sindermann*, 408 U.S. 593 [92 S.Ct. 2694, 33 L.Ed.2d 570] (1972), because the mere refusal to subsidize a fundamental right 'places no obstacle in the path' of a plaintiff seeking to exercise that right, *Harris v. McRae*, 448 U.S. at 315 [100 S.Ct. at 2687]; *see also Regan v. Taxation With Representation in Washington*, 461 U.S. 540, 549–550 [103 S.Ct. 1997, 2002–03, 76 L.Ed.2d 129] (1983); *Buckley v. Valeo*, 424 U.S. 1, 94–95 [96 S.Ct. 612, 670–71, 46 L.Ed.2d 659] (1976)."

*Planned Parenthood Federation of America, Inc. v. AID*, 915 F.2d 59, 63 (2nd Cir. 1990).

As a threshold matter, proper characterization of the nature of this case might mean that the Court need not enter into the subsidy debate outlined above. One can arguably reason that this is a case challenging the vagueness of an advance certification requirement and not one challenging a governmental decision to put restrictions on the receipt of a subsidy. In other words, one could view the certification requirement as a mere implementation of the obscenity restriction. Plaintiffs are not then challenging the government's right to restrict subsidies, but are instead limiting their challenge to the vagueness they find in the implementation of the subsidy restriction. In this view, the NEA's citations to the subsidy restriction line of cases are inapposite.

But the outcome is the same even if the Court addresses this case in terms of the subsidy issue. This case falls on the *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), side of the debate. In simple terms, the government may well be able to put restrictions on who it subsidizes, and how it subsidizes, but once the government moves to subsidize, it cannot do so in a manner that carries with

it a level of vagueness that violates the First and Fifth Amendments.

The Supreme Court stated in *Perry v. Sindermann:*

> "For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."

408 U.S. at 598, 92 S.Ct. at 2697. And so it is here. Plaintiffs cannot, and do not, claim any "right" to an NEA grant. But once the plaintiffs were chosen for grants, on the basis of artistic merit, the government may not place restrictions on disbursement of those grants that require grantees to certify to obscenity provisions that are vague in violation of the Fifth Amendment, and which correspondingly cause a chilling effect in violation of the First Amendment. The facts before the Court go well beyond a simple decision not to subsidize obscene speech.

At the hearing, defendants made the argument that the instant cases were like the subsidy decision cases in that the certification requirement "places no obstacle in the path" of a plaintiff seeking to exercise his right to speak. Defendants contended that plaintiffs could give up their subsidies altogether and still would be left with at least the same "range of choices"; e.g. they could use purely private funding for certain projects that might approach the obscenity border. The NEA argued that it was not forcing the plaintiffs into a decision between the subsidy and the right to speak.

However, the Court finds that the certification requirement does, contrary to the NEA's statements, place an obstacle in the grant recipient's path to exercise of his constitutional speech rights. As noted above, the uncontested evidence is that the NEA plays an extensive role in the financing of the arts. As noted, the NEA often marks a project or production as worthy of support, including private support, by its decision to award a grant. Accordingly, it is evident that certain private funding follows NEA grants. Therefore, because of the NEA's influential role in funding the arts in the United States, an artist cannot, as defendants claim, ignore the vague certification requirement and be no worse off than if the NEA had not entered the funding business at all. The NEA's role and influence may mean that if an artist chooses not to be bound by the NEA's obscenity restriction, he will not be able to obtain private funding, and therefore, will be worse off than if he had not applied for an NEA grant at all. This is the type of obstacle in the path of the exercise of fundamental speech rights that the constitution will not tolerate.

THEREFORE, for all of the foregoing reasons, the Court GRANTS summary judgment in favor of the plaintiffs in each action, and DENIES the defendants' motions for summary judgment. In sum, no factual matters remain in dispute, plaintiffs have established constitutional violations on the two substantive grounds discussed, and the government's defense, that its certification requirement is merely part of a subsidy decision, is unavailing.

IT IS SO ORDERED.