The BOARD OF TRUSTEES OF the LELAND STANFORD JUNIOR UNIVERSITY, Plaintiff,

v.

Louis SULLIVAN, M.D., Secretary, Health and Human Services, et al., Defendants.

Civ. A. No. 90–2656(HHG).

United States District Court, District of Columbia.

Sept. 26, 1991.

David Overlock Stewart, Peter M. Brody, Raymond C. Ortman, Jr., Ropes & Gray, Washington, D.C. (John J. Schwartz, Iris M. Brest, Susan Hoerger, Stanford, Cal., of counsel), for plaintiff.

Allan A. Ryan, Jr., Office of Gen. Counsel, Cambridge, Mass., for President and Fellows of Harvard College, amicus curiae.

John C. Cleary, Asst. U.S. Atty., Washington, D.C. (Ronald B. Guttmann, Alice A. Kelley, Office of Gen. Counsel, U.S. Dept. of Health and Human Services, of counsel), for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

The principal legal issue in this lawsuit— the extent to which the government may curtail the speech of a recipient of a government grant—is related to that which was recently resolved by the Supreme Court in *Rust v. Sullivan*, —— U.S. ——, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), a case involving abortion counseling in family planning clinics. This Court has carefully considered that decision as well as other, prior appellate law dealing with the issue in question and, in the context of pending cross-motions for summary judgment,[1] it is resolving the dispute in favor of plaintiff Stanford University.

### I

In August 1989 the National Heart, Lung, and Blood Institute (Institute) of the National Institutes of Health[2] issued a notice that it planned to award contracts for a five-year research project on an artificial heart device. The research was to be conducted at two separate academic institutions, each of which was to receive a government grant of approximately $1.5 million. The notice indicated that the contract might include a clause known as the Confidentiality of Information Clause (confidentiality clause) which would require researchers to obtain government approval before publishing or otherwise publicly discussing preliminary research results. In October 1989 Dr. Philip Oyer, a professor of cardiovascular surgery at Stanford Medical School, submitted a proposal on behalf of Stanford in response to the notice. Stanford's proposal objected to several provisions of the notice, particularly the confidentiality clause, and ultimately, when Stanford and the government could not agree with respect to the clause, the government withdrew the contract from Stanford and awarded it elsewhere.[3]

1. Plaintiff has abandoned its motion for preliminary injunction, preferring to concentrate on the merits.

2. The National Institutes of Health are component parts of the Department of Health and Human Services which is headed by Secretary Louis Sullivan.

3. In June 1990, the Institute sent the research contract—which included the clause—to Stanford for its concurrence. Stanford signed the contract, but it made its agreement to the con-

tract contingent upon the "mutually satisfactory resolution" of several issues, including its objection to the confidentiality clause.

During July and August, Stanford negotiated with the Institute about the clause. At the end of August 1990, when no agreement could be reached, the Institute withdrew the contract from Stanford, and a week later awarded it to St. Louis University Medical Center, which apparently did not object to the clause. There have been some delays with respect to the start of this research, and St. Louis University has

Stanford argues that the confidentiality clause constitutes an illegal prior restraint and an unconstitutional condition on a government benefit.[4] The relief requested is a declaratory judgment that this clause is unconstitutional and an injunction requiring the Institute to re-award the contract to Stanford.

## II

■ The confidentiality clause requires researchers to give the government advance notice of their intent to publish preliminary findings,[5] and it allows the government's contracting officer to block such publication.[6] More specifically, under the clause, a researcher must give forty-five days advance notice that he plans to publish preliminary findings. If the contracting officer objects to the publication, the researcher may file a written claim with him, and the contracting officer then has an additional sixty days in which to decide that claim. The contracting officer's ultimate decision is final and binding (except that the researcher may file suit in court). *See* 48 C.F.R. § 52.233–1.

■ It is well established that under the law this procedure constitutes a prior restraint on speech in that it allows the government to suppress the dissemination of information in advance of publication.[7]

Prior restraints are permitted "only in exceptional cases." *Near v. Minnesota*, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931). "Any system of prior restraint ... 'comes to ... Court bearing a heavy presumption against its constitutional validity.'" *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975) (*quoting Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963)).

■ These principles apply to the kind of speech involved in this case. The most typical prior restraint cases involve political or artistic speech. *See, e.g., New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (publication of Pentagon Papers); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (performance of musical "Hair"). It is equally settled, however, though less commonly the subject of litigation, that the First Amendment protects scientific expression and debate just as it protects political and artistic expression. *Miller v. California*, 413 U.S. 15, 34, 93 S.Ct. 2607, 2620, 37 L.Ed.2d 419 (1973); *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957); *United States v. U.S. District Court for Cent. Dist. of Cal.*, 858 F.2d 534, 542 (9th Cir.1988).

not yet begun the human trials of the artificial heart device. The government agrees that a resolution of this case in favor of Stanford would not significantly injure St. Louis University or any other third party.

**4.** Stanford also argues that the clause was not authorized by statute, but the Court rejects that claim. While there is no statute specifically authorizing the actions taken or contemplated by the Institute, there is broad contracting authority which is adequate to constitute statutory sanction for the actions taken by the Institute. 42 U.S.C. § 241(a)(7).

**5.** The information subjected to this prior government approval is defined as:

information which might require special consideration with regard to the timing of its disclosure may derive from studies or research, during which public disclosure of preliminary unvalidated findings could create er-

roneous conclusions which might threaten public health or safety if acted upon.
48 C.F.R. § 352.224–70(b). The information is also referred to as "findings ... which have the possibility of adverse effects on the public or the Federal agency." 48 C.F.R. § 352.224–70(f).

**6.** The confidentiality clause further prohibits disclosure of personal information about individual participants in the research study as well as of proprietary information. 48 C.F.R. § 352.-224(a). Stanford does not contest the government's restrictions on these two types of confidential information, and they are not at issue in this lawsuit.

**7.** It is immaterial that the restraint does not last forever. Even a restraint of speech for a limited period is inconsistent with the First Amendment. *See, e.g., New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

The defendants now concede [8] that the government could not impose the kind of restraint contemplated by the regulation on scientists whose research is not paid for by a government grant or contract. The question before the Court therefore is whether the grant of public funds takes the present situation out of the category of impermissible suppression of speech.

### III

Prior to the issuance by the Supreme Court of the *Rust* decision earlier this year, the law regarding speech-type conditions attached to government grants was less than clear. Although there were factual differences among the cases which could be, and were, cited as responsible for the particular results reached in the various cases, it has become increasingly difficult to discern a principled rule applicable to all the various situations.

Among the principal decisions in recent years upholding the constitutionality of speech-type restrictions accompanying particular contracts or subsidies are *Regan v. Taxation Without Representation (TWR)*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Cammarano v. United States*, 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959); *DKT Memorial Fund Ltd. v. Agency for*

*Int'l Dev.*, 887 F.2d 275 (D.C.Cir.1989); and among those which found restrictions to be invalid are *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *FCC v. League of Women Voters*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984); *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030 (D.C.Cir. 1980); *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958).[9]

In view of the confusion among the prior decisions, if for no other reason, it is most useful to concentrate on the holding and reasoning in the decision handed down earlier this year in *Rust*. Moreover, to the extent that prior decisions of the Supreme Court or the lower courts conflict with *Rust*, they have of course been expressly or impliedly overruled.

In *Rust v. Sullivan*, the Supreme Court upheld a regulatory restriction [10] which prohibits health professionals in government-funded family planning clinics from discussing abortion with their patients. After referring to and analyzing the cases referred to above, the majority of the Supreme Court concluded that the restriction does not impinge on the First Amendment

8. Transcript of July 12, 1991 Hearing at 52. Further, although at one stage of this litigation defendant appeared to contend to the contrary, Opposition to Summary Judgment at 5 n. 4, this case does not involve commercial speech. Stanford seeks to engage in five years of research, not to "propose a commercial transaction." *Board of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473, 109 S.Ct. 3028, 3031, 106 L.Ed.2d 388 (1989). Defendants later conceded this point. Transcript of July 12, 1991 Hearing at 39.

Equally unpersuasive is the defendants' claim that, inasmuch as the government could have hired scientists as employees, a diminution of the free speech rights of scientists affiliated with a university receiving government monies is less offensive to the law than it might otherwise be. *Id.* at 6 n. 5. Even assuming that the premise is correct, that kind of an argument could be made with respect to almost any activity, and its acceptance would in practice erode First Amendment freedoms on the widest scale.

9. There are, to be sure, some significant factual differences among the cases. For example, *TWR* and *Cammarano* involved tax preferences;

*DKT Memorial Fund* the receipt of population planning funds; *Arkansas Writers' Project* tax exemption for some but not all publications; and *League of Women Voters* grants to broadcasters conditioned upon their not editorializing.

Defendants attempt to distinguish several of the decisions which are adverse to their position on the basis that the restrictions there, but not here, were content-based. Defendants' Opposition to Summary Judgment at 14. However, it is difficult to understand how it could be claimed that the restriction in the instant case is not content-based. Stanford, on the other hand, claims to find in the decisions a motivational rationale, see, e.g., Stanford's Reply at 17, a stand that is likewise unpersuasive.

10. The restriction at issue was promulgated by the Secretary of Health and Human Services to implement Title X of the Public Health Service Act, 42 U.S.C. §§ 300 *et seq.* There was a question whether the regulation actually implemented the statute, *see* Justice Stevens' dissent, but the majority of the Court answered that question in the affirmative.

rights of these medical workers and that it is therefore valid. That of course is the law and this Court, like all lower courts, is bound thereby. There are, however, two bases upon which, under the *Rust* Court's own language, the *Rust* result does not follow here.

First. The Supreme Court made a sharp distinction in *Rust* between the denial of a benefit to an individual on account of his speech or expression (which is constitutionally prohibited) and an insistence that public funds be spent for the program purposes for which they were authorized (which the Constitution allows). Said the Court:

> The Secretary's regulations do not force the Title X grantee to give up abortion-related speech; they merely require that the grantee keep such activities separate and distinct from Title X activities. Title X expressly distinguishes between a Title X *grantee* and a Title X *project* ... The Title X *grantee* can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it simply is required to conduct these activities through programs that are separate and independent from the project that receives Title X funds.
>
> In contrast, our "unconstitutional conditions" cases involve situations in which the government has placed a condition on the *recipient* of the subsidy rather tha[n] on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally-funded program.

111 S.Ct. at 1774 (emphasis in original) (citations omitted).

The regulations at issue in the instant case broadly bind the grantee and not merely the artificial heart project. Dr. Oyer and the other individuals working for Stanford [11] on the project are prohibited by defendants' regulations from discussing preliminary findings of that project without permission. Unlike the health professionals in *Rust*, the Stanford researchers lack the option of speaking regarding artificial heart research on their own time, or in circumstances where their speech is paid for by Stanford University or some other private donor, or not paid for by anyone at all. Regardless of the circumstances, during the contract's five-year life [12] they may not speak about the project's results or its progress without the express prior permission from defendants' contracting officer.

The Supreme Court's discussion in *Rust* which, notwithstanding the result reached there, specifically reaffirmed the unconstitutionality of speech-related restrictions applicable to recipients of government funds as such, compels the conclusion that the defendants' restrictions in the instant case lack constitutional validity. The regulation at issue here is not tailored to reach only the particular *program* that is in receipt of government funds; it broadly forbids the *recipients* of the funds from engaging in publishing activity related to artificial heart research at any time, under any auspices, and wholly apart from the particular program that is being aided.[13]

Second. Other language of the Supreme Court has a similar impact on the issues in this case. The Court recalled in *Rust* that it had previously "recognized that the uni-

---

**11.** It may be that Stanford University and all those affiliated with it are under a like prohibition. Transcript of July 12, 1991 Hearing at 28.

**12.** The ban on discussing unvalidated findings may last longer than the five-year contract period, for if the government considers results to be "preliminary" and "unvalidated," it could bar publication even after the contract is over.

**13.** Defendants' ban on preliminary reporting could not validly be defended on the basis that it is tied to the heart research program rather than the researchers, for the latter, as noted, would be precluded from speaking or publish-

ing about artificial heart research even on their own time. Any attempt to examine such speech or publication with a view to determining whether or not the information came to these scientists as a consequence of their work on the federally-financed project or from their general familiarity with the subject would require such intrusive examination into thought processes that it could not conceivably be undertaken. It should be noted in this connection that Dr. Oyer has worked for almost twenty years on the development of a self-contained artificial heart device.

versity is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment." [14] This explicit exception to the broader ruling in *Rust* is directly on point here. The plaintiff is of course a university. The subject of this lawsuit is the very free expression that the *Rust* Court held to be so important for the functioning of American society that it may be curtailed through conditions attached to grants or contracts only if these conditions are not vague or overbroad. Yet, the conditions imposed by the defendants are plainly in that category.

The regulations permit the contracting officer to prevent Stanford from issuing "preliminary unvalidated findings" that "could create erroneous conclusions which might threaten public health or safety if acted upon," or that might have "adverse effects on ... the Federal agency." 48 C.F.R. § 352.224–70. In the view of this Court, these standards are impermissibly vague. Under what circumstances are preliminary findings regarded as "validated"? Who will decide whether the conclusions drawn by Stanford are erroneous—the nonscientist contracting officer? [15] What is meant by the phrase that a report "could" create erroneous conclusions? How would

it be determined that such a conclusion "might threaten public health or safety," [16] and to what degree of certainty would there have to be a threat to public health and safety? What kind of a threat? What would be regarded as an adverse effect "on the Federal agency?" Would such an effect have to be concrete, financial, reputational, or of some other nature? To pose these questions, and others that could be asked, is to reveal the vagueness of the standards.

There is the related problem of the chilling effect of these vague and overbroad conditions. It is impossible for a grantee such as Stanford and its chief researcher Dr. Oyer to know what might be regarded as a violation of these amorphous standards. Because of the vagueness and subjectivity of the administrative regulation, a responsible grantee could be certain of not being in violation only if it refrained from publishing any preliminary findings not endorsed by the contracting officer. Thus, the qualifying phrases referred to above are not likely to effect any real diminution of the otherwise unfettered authority of the contracting officer, and no prudent grantee is likely to publish that which the contracting officer has not cleared even if the reasons for the refusal to clear appear to be wholly invalid. [17] In sum, this case fits snugly in the "free expression at a university" category that *Rust* carved out

---

14. 111 S.Ct. at 1776. The Court cited *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 605–06, 87 S.Ct. 675, 683, 684–85, 17 L.Ed.2d 629 (1967), in support of that statement. *See also, Big Mama Rag, Inc., supra,* 631 F.2d at 1034; *Bella Lewitzky Dance Foundation v. Frohnmayer,* 754 F.Supp. 774, 782–83 (C.D.Cal.1991).

15. The contracting officer need not even be, and in this instance he apparently is not, a medical doctor or a scientist.

16. In fact, defendants' claim that the condition is designed to protect public health and safety, Opposition to Summary Judgment at 5 n. 4, is also off the mark. Defendants point to cases in which government agencies tried to protect members of the public from false claims by commercial purveyors of medicine and therapies. But no such public health hazard is posed in this case if only because only twenty of the artificial heart devices will be made available,

and their availability will be strictly controlled under the research regime. And of course there is not the slightest reason to believe that the Stanford scientists—who are not in the business of selling patent medicines—will be making fraudulent claims when they publish learned articles on artificial heart research.

Defendants' stated goal of protecting prospective patients from unwarranted hope (that might result from the issuance of preliminary findings by Stanford scientists not screened in advance by a government contracting officer), *id.* at 10, constitutes a strange and attenuated way of protecting health and safety. Neither these defendants nor any other public officials have statutory or other authority to regulate citizens' hopes.

17. Indeed, under the regulation, the contracting officer may suppress a preliminary report on the basis of "any objections;" the objections need not be material, significant, or valid.

of its general ruling on speech conditions attached to grants.

## IV

Defendants' approach to this case is that, since public funds will be expended on the artificial heart research at issue here, the burden is on plaintiff Stanford University to explain why and under what circumstances it should be relieved of the obligation to submit its publications on this subject to the government for its prior approval. That approach views the issue from the wrong end of the telescope.

Stanford University, a premier academic institution, engaged in significant scientific and medical research for the benefit of the American people, is not *ipso facto* compelled under the law to surrender its free speech rights and those of its scientific researchers to a "contracting officer" merely because a regulation issued by defendants so directs. There exists, after all, the First Amendment to the Constitution, the supreme law of the land, which protects those very rights.

The Supreme Court decided in *Rust v. Sullivan* that when the government grants money to an institution or a program, it may under certain circumstances condition that grant upon curtailment of the program participants' rights under the First Amendment. Defendants' argument in this case is that that decision is applicable to government grants and contracts generally, without substantial limitation. The

*Rust* decision opened the door to government review and suppression of speech and publication in areas which had theretofore been widely thought immune from such intrusion; the government's position in this case, if endorsed by the courts, would take that door off its hinges.

That position must be viewed in the context of the fact that few large-scale endeavors are today not supported, directly or indirectly, by government funds—from the health care of senior citizens, to farm subsidies, to the construction of weaponry, to name but a few of the most obvious. Defendants' proposal would, at least potentially,[18] subordinate the free speech rights of the participants in the programs receiving such federal monies to the government's wishes. To put it another way, if the Supreme Court decision were to be given the scope and breadth defendants advocate in this case, the result would be an invitation to government censorship wherever public funds flow, and acceptance by the courts of defendants' position would thus present an enormous threat to the First Amendment rights of American citizens[19] and to a free society.[20]

This Court, like all lower courts, is of course bound by the *Rust* decision. But for the reasons stated, the Court will not, without explicit appellate direction, further narrow[21] the speech and expression rights of citizens and organizations, or subject to government censorship the publications of institutions of higher learning and others engaged in legitimate research. No such

18. All it would take to transform the potential into reality would be a regulation similar to the one promulgated by the defendants here, and a somewhat plausible rationale. *See Chevron v. National Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

19. That is not to say that all the various departments and agencies of the government may be expected to rush out at once to curtail the free speech rights of those with whom they deal. But establishment of the principle that such action can pass constitutional muster is sure to be implemented, and it is bound to have increasingly wide negative effects on a free society, as the legality of censorship accompanying federal monies becomes more and more common and thus more and more deeply ingrained in the fabric of government and society.

20. Defendants' position also conflicts with the trend in this country, as well as elsewhere, to allow citizens and organizations to speak and otherwise to operate without intrusive official direction. Even in the Soviet Union, where Joseph Stalin at one time decided what could be published and by whom, the dead hand of government control of scientific research and publication is apparently no more.

21. In *Rust,* in a holding reminiscent in its detail of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court even upheld a regulatory requirement that prescribed. in so many words what the physicians and nurses in family planning clinics must say when asked by a woman patient about abortions.

appellate direction has been given; on the contrary, as explained above, *Rust* is consistent with a decision to allow Stanford to use its own judgment on when and what to publish, notwithstanding that its research is supported with federal funds. The Court will accordingly issue an injunction which will have the effect of prohibiting defendants from interfering with the university's freedom to publish.

ford University Contract No. N01–HV–08110, a contract involving a left ventricular heart system or device, without including a provision requiring the approval of a contracting officer or other government official prior to publication or discussion of preliminary research results.

## V

■ What remains to be decided is what relief is appropriate. Defendants argue that their Department should be given the opportunity "to resolicit the contract following appropriate procurement procedures." Motion to Dismiss at 32. However, it is plain that the contract would have remained with Stanford but for the illegal confidentiality clause. Under these circumstances, a court may order that the contract be awarded to the disappointed party without an additional round of procurement proceedings. *Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 204 (D.C.Cir.1984). The judgment being issued contemporaneously herewith therefore so provides.

## ORDER

Upon consideration of plaintiff's motions for a preliminary injunction and for summary judgment; defendants' motion for summary judgment; the oppositions, replies, and supplemental memoranda; the hearing on the motions; and the entire record herein; it is this 26th day of September, 1991, in accordance with the Opinion issued contemporaneously herewith

ORDERED that defendants' motion for summary judgment be and it is hereby denied; and it is further

ORDERED that plaintiff's motion for summary judgment be and it is hereby granted; and it is further

ORDERED that judgment be and it is hereby entered in favor of plaintiff; and it is further

ORDERED that the Secretary of Health and Human Services shall award to Stan-