In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-2589

CAMELOT BANQUET ROOMS, INC., et al.,

*Plaintiffs-Appellees*,

*v.*

UNITED STATES SMALL BUSINESS ADMINISTRATION, et al.,

*Defendants-Appellants*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:21-CV-00447-LA — **Lynn Adelman**, *Judge*.

ARGUED NOVEMBER 1, 2021 — DECIDED JANUARY 26, 2022

Before KANNE, ROVNER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Plaintiffs-appellees in this case are twenty-three businesses all over the country that offer live adult entertainment in the form of nude or nearly nude dancing. They seek to obtain loans under the second round of the Paycheck Protection Program enacted by Congress to address economic disruption caused by the COVID-19 pandemic. By statute, Congress excluded plaintiffs and several other categories of businesses from the second round of the Program.

See 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa), incorporating 13 C.F.R. § 120.110, with two exceptions.

Plaintiffs assert that their exclusion from the Program violates their constitutional rights, primarily under the Free Speech Clause of the First Amendment. The district court agreed. It issued a preliminary injunction that enjoins the United States Small Business Administration (SBA) from denying plaintiffs eligibility for the loan program based on the statutory exclusion that incorporates 13 C.F.R. § 120.110. *Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin.*, — F. Supp. 3d —, 2021 WL 3680369 (E.D. Wis. Aug. 19, 2021). We granted the government's stay of the preliminary injunction, expedited briefing on the merits of this appeal, and held oral argument on November 1, 2021. We now conclude that the district court erred in granting the preliminary injunction.

I.   *Applicable Legal Standards*

Plaintiffs who seek a preliminary injunction must show that (1) they will suffer irreparable harm in the absence of an injunction, (2) traditional legal remedies are inadequate to remedy the harm, and (3) they have some likelihood of success on the merits. If those elements are shown, the court must then balance the harm the moving parties would suffer if an injunction is denied against the harm the opposing parties would suffer if one is granted, and the court must consider the public interest, which takes into account the effects of a decision on non-parties. E.g., *Courthouse News Service v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

On the merits, the district court concluded that plaintiffs are likely to succeed on their free speech claim. The court viewed the exclusion of plaintiffs from the Program as an

"attempt to suppress a dangerous idea" and a classification that was not rationally related to a legitimate government purpose. The court found that the other factors also supported an injunction. Receiving funds under the Program only at the end of the lawsuit would likely come too late for plaintiffs' businesses to survive, and if it turned out that their constitutional rights were violated, they would have no viable damages remedy against the government or any official. The court saw little harm to the government from an injunction, which it thought would also serve the public interest by aiding struggling businesses, consistent with the aims of the broader COVID relief legislation.

On appeal, we review the district court's issuance of a preliminary injunction for an abuse of discretion, though an error of law can often produce an abuse of discretion. E.g., *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 896 (7th Cir. 2001); *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 13 (7th Cir. 1992). In this appeal, we disagree with the district court's pivotal conclusions about the applicable constitutional law and on that basis find an abuse of discretion. As we explain below, the SBA has shown a strong likelihood of success on the merits. The other injunction factors are essentially a wash, so the final result is driven by the likelihood of success on the merits.

II. *The Paycheck Protection Program*

No one who has lived through the COVID-19 pandemic will forget its devastating consequences for lives and health or the massive economic disruption it has caused. Congress responded with several rounds of massive economic assistance, including the Paycheck Protection Program. Under the Program, many small businesses became eligible for low-

interest loans that would be guaranteed by the federal government and even eligible for forgiveness if the businesses used them, in essence, to keep employees on the payroll during the economic downturn.

The first round of legislation was drafted and enacted in just a few weeks. That legislation gave the SBA considerable discretion to decide eligibility for the Program. In doing so, the SBA borrowed from a regulation that identifies categories of businesses that are not eligible for all or nearly all SBA loan programs. See 13 C.F.R. § 120.110. The list includes non-profit enterprises, banks and other financial companies, life insurance companies, businesses located in foreign countries, pyramid sale distribution plans, casinos and other gambling businesses, loan packagers, political or lobbying businesses, and speculative businesses.

Subsection (p) of that regulation excludes plaintiffs. It bars loans to businesses that:

> (1) Present live performances of a prurient sexual nature; or
>
> (2) Derive directly or indirectly more than de minimis gross revenue through the sale of products or services, or the presentation of any depictions or displays, of a prurient sexual nature….

13 C.F.R. § 120.110(p).

In the first round of Paycheck Protection Program loans, the SBA made an exception for non-profits, which the statute expressly deemed eligible. See 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020). In an earlier related case brought by plaintiff Camelot Banquet Rooms in the Eastern District of Wisconsin, the

district court issued a preliminary injunction barring denial of eligibility for the Program based on the regulation. That decision relied on statutory, administrative-law, and constitutional grounds. *Camelot Banquet Rooms, Inc. v. U.S. Small Business Admin.*, 458 F. Supp. 3d 1044 (E.D. Wis. 2020). We denied a stay of that injunction in a conclusory order, and the government soon dismissed the appeal. But see *Pharaohs GC, Inc. v. U.S. Small Business Admin.*, 990 F.3d 217 (2d Cir. 2021) (affirming denial of injunction in similar first-round case brought by adult-entertainment club); *American Ass'n of Political Consultants v. U.S. Small Business Admin.*, 810 F. App'x 8, 9–10 (D.C. Cir. 2020) (affirming denial of injunctive relief in similar First Amendment challenge to first-round exclusion of lobbying and political consulting businesses).

The second round of the Paycheck Protection Program was drafted with more time, and it took a different approach to eligibility. Congress adopted statutory language to exclude several categories of businesses, including plaintiffs' adult-entertainment venues. It did so by incorporating into the statute the terms of 13 C.F.R. § 120.110, the regulation that the SBA had used on its own initiative for the first round. 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa).[1]

---

[1] Congress made exceptions for two categories of businesses in the regulation, not-for-profit businesses and businesses engaged principally in teaching, instructing, counseling, or indoctrinating religion or religious beliefs. 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa). The new exception for religious businesses is easy to understand in light of *Trinity Lutheran Church v. Comer*, 137 S. Ct. 2012 (2017) (religious school could not be excluded from government program to assist school playground construction). The Supreme Court has shown no indication that it would extend the Free Exercise Clause reasoning of *Trinity Lutheran* to cases like this one.

Accordingly, in this second round, the earlier issues of statutory interpretation and administrative law have fallen away. Plaintiffs can prevail only if denying them a subsidized loan under the Program violates the Constitution. Plaintiffs are unlikely to be able to make that showing.

III. *Plaintiffs' First Amendment Theory*

Plaintiffs' core claim is under the Free Speech Clause of the First Amendment. They contend that excluding them from the Program penalizes them for engaging in expressive activity protected by the First Amendment. See generally *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66 (1991) (plurality opinion) (treating nude dancing as "marginally" within outer perimeters of First Amendment protection; affirming local ban on completely nude dancing).

The problem with plaintiffs' First Amendment claim and the preliminary injunction here is that Congress is not trying to regulate or suppress plaintiffs' adult entertainment. It has simply chosen not to subsidize it. Such selective, categorical exclusions from a government subsidy do not offend the First Amendment.

The Supreme Court has repeatedly drawn a line between government regulation of speech, on one hand, and government subsidy of speech, on the other. Its decisions show that the government is not required to subsidize activity simply because the activity is protected by the First Amendment. E.g., *Ysursa v. Pocatello Education Ass'n*, 555 U.S. 353, 358–59 (2009) ("While in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political ones;" state could choose not to carry out payroll deductions

for political contributions to labor unions); *Rust v. Sullivan*, 500 U.S. 173, 193 (1991) ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other."); *Regan v. Taxation With Representation*, 461 U.S. 540, 549 (1983) ("[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right…."); accord, e.g., *Wisconsin Education Ass'n Council v. Walker*, 705 F.3d 640, 646–47 (7th Cir. 2013).

To avoid the controlling line of subsidy cases, plaintiffs focus on language in *Regan* suggesting that a selective subsidy program may violate the First Amendment if it is "aim[ed] at the suppression of dangerous ideas." 461 U.S. at 548. To take an easy example of such viewpoint discrimination, even if Congress can choose to exclude political lobbyists entirely from the Program's subsidies, it could not choose to subsidize Democratic lobbyists while excluding Republicans. Plaintiffs' theory here is that Congress chose to exclude their businesses from the subsidy program because it deemed their "ideas" about sexuality to be dangerous.

This theory fails to distinguish between government *suppression* of protected activity and *denial of a subsidy*. Plaintiffs' theory seems to be that the denial of a subsidy *is itself the act of suppression*. That theory loses sight of the difference between regulation and denial of a subsidy—the difference at the heart of *Regan*, *Rust*, *Ysursa*, and the rest of the selective-subsidy line of cases. The only sign we see here of a supposed

effort to "suppress" is the choice not to subsidize. Whatever door *Regan* left open—and as far as we can tell, the Supreme Court has never struck down a denial of subsidy on this ground—it surely requires something more, like viewpoint discrimination, than denial of the subsidy itself. See *Wisconsin Education Ass'n*, 705 F.3d at 650–52, and *id*. at 664–70 (Hamilton, J., dissenting in relevant part) (majority and dissent debating evidence of viewpoint discrimination in state's choice to subsidize payroll deductions for dues for some public employee unions but not others).

IV. *Rational-Relation Review*

Like any statutory classification, the statutory boundaries of the Paycheck Protection Program are subject to rational-relation review. See, e.g., *Ysursa*, 555 U.S. at 359, citing *Regan*, 461 U.S. at 546–51. The district court found here that the exclusion of plaintiffs' adult-entertainment businesses failed the rational-relation test.

The district court applied an erroneous and unduly rigorous form of judicial review, second-guessing legislative decisions and compromises on policy grounds, and concluding that the Program was both over- and under-inclusive in various respects. See *Camelot Banquet Rooms, Inc.*, — F. Supp. 3d at —, 2021 WL 3680369, at *8–11. A government spending program, especially one responding to an economic emergency, is subject to the least rigorous form of judicial review. In enacting such legislation, Congress must respond quickly to an emergency and must hammer together a coalition of majority votes in both houses. The need for compromises and trade-offs is never greater.

When pressed in this suit to justify the exclusion of plaintiffs from the Program's subsidies, the government pointed to the "secondary effects" of sex-oriented businesses that can be used to justify time, place, and manner regulations of such businesses. See, e.g., *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000) (plurality opinion); *BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015). Plaintiffs and the district court responded by criticizing Congress for not having made a record on the subject at the time the legislation was enacted.

Any expectation that Congress would have taken the time to make such a record is unrealistic, to put it mildly. And any requirement that Congress make such a record is contrary to constitutional doctrine. The rational-relation test requires a challenger in litigation to exclude any possible rational grounds that the legislature might have deemed sufficient for the statutory distinction. E.g., *Heller v. Doe*, 509 U.S. 312, 319–20 (1993). It does not require the legislature to have made a contemporaneous record on the subject. *Id*. at 320–21, discussed in *Wisconsin Education Ass'n*, 705 F.3d at 653 (rational basis for limit on government subsidies need not be in the record "so long as it finds 'some footing in the realities of the subject addressed by the legislation'").

Similarly, the view that the rationale for excluding plaintiffs is under-inclusive has little impact under the rational-relation test. All sorts of legislative classifications, exclusions, and compromises pass muster even if they are over- or under-inclusive. "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some

inequality,'" and "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Heller*, 509 U.S. at 321, first quoting *Dandridge v. Williams*, 397 U.S. 471, 485 (1970), and then quoting *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70 (1913).[2]

Plaintiffs also suggest that the government's defense based on secondary effects of sex-oriented businesses actually serves to condemn plaintiffs' exclusion from the Program. They say the arguments show the government's hostility to their "dangerous ideas." This argument turns the rational-relation test upside down. Those secondary effects are well known and widely recognized in First Amendment litigation and doctrine. See generally, e.g., *City of Erie*, 529 U.S. at 289–301 (plurality opinion). Actual evidence of them can serve to justify time, place, and manner restrictions on businesses that are subject to "intermediate" constitutional scrutiny. We do not see how relying on those effects shows animus toward any idea. If those secondary effects can support time, place, and manner regulations, they surely provide a rational basis for Congress to choose not to subsidize this group of businesses.

Plaintiffs' arguments also lose sight of the fact that they were not singled out for this exclusion, even among

---

[2] Illustrating the sorts of inconsistencies that are tolerated under the rational-relation test, five of the original plaintiffs-appellees withdrew from this case because defendant SBA funded their separate requests for COVID relief under the separate Restaurant Revitalization Fund established under 15 U.S.C. § 9009c as part of the American Rescue Plan Act of 2021, which uses different eligibility standards. See Motion for Partial Dismissal of Certain Appellees, Dkt. No. 45 (Nov. 23, 2021).

businesses engaged primarily in activity protected by the First Amendment. Congress also chose to exclude from the Program businesses "primarily engaged in political or lobbying activities." 13 C.F.R. § 120.110(r). Such business activities are much closer to the core of the First Amendment than the dances at plaintiffs' bars and clubs. Yet lobbyists and political consultants were also excluded. Congress chose not to require taxpayers to subsidize them. We do not see a plausible constitutional basis for requiring government subsidies of lobbyists, at least as long as there is no viewpoint discrimination. Accord, *American Ass'n of Political Consultants*, 810 F. App'x at 9–10.

Congress also excluded many other categories of businesses: banks, lenders, finance companies, and some pawn shops; life insurance companies; businesses located in foreign countries; pyramid sale distribution plans; businesses engaged in any illegal activity; private clubs; government-owned businesses; loan packagers; businesses with an "Associate" who is in prison, on probation, on parole, or who has been indicted for a felony or crime of moral turpitude; and businesses that have previously defaulted on SBA or other federally assisted loans. See 15 U.S.C. § 636(a)(37)(A)(iv)(III)(aa), incorporating 13 C.F.R. § 120.110, with two exceptions.

These exclusions are not difficult to understand in terms of policy and politics. They all help defuse potential criticisms of a generous emergency program that might be used to undermine political support for the Program and the overall legislation. Such tailoring of legislation to build and maintain political support is perfectly constitutional, at least in the

absence of viewpoint or invidious discrimination, of which
there is no sign here.[3]

V.  *Viewpoint Discrimination*

The district court was also persuaded to apply more strin-
gent judicial review. The theory was that even if the exclusion
of plaintiffs' businesses from the Program was not "tradi-
tional viewpoint discrimination," the exclusion's focus on
"prurience" created a free-speech problem. The exclusion, as
the court saw the issue, depends on prurience, which the
court saw as the expressive, "sexually arousing" "message"
of the adult entertainment. *Camelot Banquet Rooms, Inc.*, — F.
Supp. 3d at — & n.7, 2021 WL 3680369, at *9–10 & n.7. The
court viewed the exclusion as thus an effort to use a subsidy
exclusion to suppress a "dangerous idea," which *Regan* sug-
gested could violate the First Amendment. 461 U.S. at 548.

Plaintiffs' argument along these lines is creative but not
consistent with the role that prurience plays in the larger
sweep of First Amendment doctrine. The statutory exclusion
from the Program of businesses with prurient live entertain-
ment is better understood not as viewpoint discrimination but
as a permissible classification based on subject matter. The Su-
preme Court made this point in *R.A.V. v. City of St. Paul*:

> When the basis for the content discrimination
> consists entirely of the very reason the entire

---

[3] The Constitution does not prohibit legislation on the basis of moral-
ity. Consider, for example, the possibility that Congress might choose to
exclude from this or other subsidy programs alcoholic beverage makers,
casinos and other gambling businesses, weapons makers, and so on. Such
line-drawing is left to the legislature, absent viewpoint or invidious dis-
crimination.

> class of speech at issue is proscribable, no signif-
> icant danger of idea or viewpoint discrimina-
> tion exists. Such a reason, having been adjudged
> neutral enough to support exclusion of the en-
> tire class of speech from First Amendment pro-
> tection, is also neutral enough to form the basis
> of distinction within the class. To illustrate: A
> State might choose to prohibit only that obscen-
> ity which is the most patently offensive *in its
> prurience*—*i.e.*, that which involves the most las-
> civious displays of sexual activity. But it may
> not prohibit, for example, only that obscenity
> which includes offensive *political* messages.

505 U.S. 377, 388 (1992), citing *Kucharek v. Hanaway*, 902 F.2d
513, 517 (7th Cir. 1990).

In effect, the Court was telling us, it would be a category
mistake to think that prurience or lasciviousness reflects a
"viewpoint" that the government may not discriminate
against. The terms instead identify a category or subject mat-
ter of expressive conduct that may be subject to some forms
of government regulation. That's the point we made in the
*Kucharek* case cited in *R.A.V.* We said that a statute could pro-
hibit obscene (prurient) material entirely (a subject matter)
but could not "distort the marketplace of erotic discourse by
suppressing only that obscenity which conveys a disfavored
message." 902 F.2d at 517.

Accordingly, excluding the entire category or subject mat-
ter of prurient live performances from a government subsidy
program does not amount to viewpoint discrimination and
does not violate the Free Speech Clause. See *Pharaohs GC*, 990
F.3d at 231 (term "prurient" in SBA regulation describes

subject matter, not viewpoint, for exclusion from Program); *PMG Int'l Division L.L.C. v. Rumsfeld*, 303 F.3d 1163, 1171 (9th Cir. 2002) (treating "lascivious" materials as articulating a "viewpoint" would "risk eviscerating altogether the line between content and viewpoint"); *General Media Communications, Inc. v. Cohen*, 131 F.3d 273, 282 (2d Cir. 1997) ("[H]ow, for example, would one go about discussing and considering the political issues of the day from a lascivious viewpoint?").

VI. *Unconstitutional Conditions Doctrine*

Plaintiffs also rely on a line of First Amendment and other constitutional decisions in which the Supreme Court has held that a government may not condition certain government benefits upon a recipient's agreement to refrain from exercising her constitutional rights. For instance, in *Speiser v. Randall*, the Supreme Court declared unconstitutional a condition on a property tax exemption that required owners to sign declarations stating that they did not "advocate the overthrow of the Government of the United States … by force or violence." 357 U.S. 513, 515 (1958). As the Court explained: "To deny an exemption to claimants who engage in certain forms of speech is in effect to penalize them for such speech." *Id.* at 518. The condition was thus unconstitutional. See also, e.g., *FCC v. League of Women Voters of California*, 468 U.S. 364 (1984) (federal financial assistance to non-commercial radio and television stations conditioned on stations refraining from any editorializing; condition violated First Amendment).

Plaintiffs argue here that the exclusion of prurient businesses constitutes an unconstitutional condition on Program funding. As explained above, however, the Court has also said repeatedly that Congress is not required to "grant a

benefit such as [a tax exemption] to a person who wishes to exercise a constitutional right." *Regan*, 461 U.S. at 545.

How does one tell the difference between an unconstitutional condition and a permissible congressional choice about whom to include in a government spending or subsidy program? It can be difficult in close cases, but the Supreme Court provided guidance in *Agency for International Development v. Alliance for Open Society International, Inc.*, 570 U.S. 205 (2013), where the Court addressed grants to non-governmental organizations to combat HIV/AIDS around the world. Congress had prohibited using the money to promote legalization of prostitution or human trafficking. That condition was not even challenged in the case and posed no First Amendment problem. But the statute also required grant recipients to adopt a policy "explicitly opposing prostitution and sex trafficking." *Id.* at 210, quoting 22 U.S.C. § 7631(f). The Court struck down that policy requirement.

The Court explained the familiar scope of the government's spending power: "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." 570 U.S. at 214. "At the same time, however, we have held that the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit.'" *Id.* (omission in original), quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 59 (2006). To distinguish between permissible limits on spending programs and unconstitutional conditions, the Court clarified that "the relevant distinction … is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to

subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Id*. at 214–15.

The Court acknowledged that this line is "hardly clear" and should not turn the First Amendment into "a simple semantic exercise," *id*. at 215 (citation omitted), but after discussing *Regan*, along with *League of Women Voters*, 468 U.S. at 399–401, and *Rust*, 500 U.S. at 193, 196, the Court found that the condition requiring recipients to adopt specific policy views about prostitution and sex trafficking was not permissible because it went "outside the scope of the federally funded program." 570 U.S. at 218, quoting *Rust*, 500 U.S. at 197. The condition on the activities the government would fund, however, so as not to subsidize advocacy of prostitution or human trafficking, was not even challenged in the case, and we have no doubt it was permissible under the First Amendment.

The Paycheck Protection Program limits at issue in this case fit comfortably on the permissible *Regan*, *Rust*, and *Ysursa* side of the line as conditions that limit the scope of the subsidy/loan program. Just as Congress was not trying to require lobbyists to stop lobbying as a condition of the Program, it was not trying to pressure plaintiffs to change their adult entertainment. Congress was instead simply choosing to exclude certain categories of businesses from the program. In the words of *Regan*, Congress "has not infringed any First Amendment rights or regulated any First Amendment activity" by excluding prurient businesses from receiving Program funding. See 461 U.S. at 546. We thus agree with the Second and District of Columbia Circuits that the Program's exclusions are not designed to regulate speech. See *Pharaohs*, 990

F.3d at 229–30 (for Program's first round of loans, the prurience exclusion did not "improperly leverage[ ] the subsidy to regulate speech"); *American Ass'n of Political Consultants*, 810 F. App'x at *9 (Program's lobbying exclusion did not "seek to leverage funding to regulate speech outside the contours of the [Program] itself," quoting *Alliance for Open Society*, 570 U.S. at 214–15).

VII.    *Other Factors for Injunctive Relief*

Finally, the other factors for an injunction either favor the government or are neutral. Each side faces a threat of irreparable harm, depending on whether an injunction is issued.

If the government were erroneously required to guarantee subsidized loans to plaintiffs, there is no reason to expect that it could recover such funds. Because the government is likely to prevail on the merits, denying plaintiffs an injunction serves the public interest by implementing the policy chosen by Congress.

On the other hand, if the government were unlikely to prevail on the merits, an injunction would serve the public interest by enforcing constitutional rights and allowing plaintiffs to take advantage of a generous program of emergency economic relief.  If we are mistaken in denying injunctive relief to plaintiffs, they risk going out of business, and governmental immunity would prevent any monetary recovery from the government or its officials. That risk is mitigated somewhat by the government's assurances that it has set funds aside for plaintiffs during the course of this litigation, but we recognize that delay in providing those funds could prevent plaintiffs from benefiting at all. On balance, however, the government's

strong likelihood of success on the merits weighs decisively against a preliminary injunction.

   For these reasons, the district court's preliminary injunction is VACATED and the case is REMANDED for further proceedings.